# WILLIAM J. WILSON, Appellant, v. JACKSON et al.

### Division One, February 19, 1902.

1. **Capacity to Contract: WILL: CONTRACT: DIFFERENCE: STRONGER MIND.** One may have mental capacity to make a will, where there is no overreaching mind to contend with, and yet be incompetent to contract with a living person seeking his own advantage. But it is not sufficient, in order to set aside a contract, to show that the man who complains was not as strong-minded as the other.

2. ———: **FACTS: OPINION.** Where a number of witnesses gave it as their opinion that defendant was weak-minded and incapacitated to make a contract for the exchange of land, but gave no fact upon which such opinion of incapacity could be based, there being no fiduciary relation, the judgment of the circuit court setting the deeds aside will be reversed.

3. **Fraud: MISREPRESENTATION: OPINION.** Misrepresentations of what lands may be made to produce (rather than what they had produced) being matters of opinion, are not such misrepresentations of facts, even if unwarranted, as will vitiate a contract.

4. ———: **EXCHANGE OF LANDS: DISCREPANCY IN VALUE.** Where defendant in the exchange of lands obtained two hundred acres in Alabama assessed at $1,000 and exchanged eighty acres of Missouri land therefor worth $1,600, there is no such descrepancy in value as calls for equitable relief.

5. ———: **SETTING ASIDE DEED.** The facts of this case are reviewed and it is held that there was no evidence on which to base the decree setting aside a deed from defendant to plaintiff for the land in suit, and, therefore, that decree is reversed, and judgment for ouster and for damages for rents and profits is directed to be entered.

Appeal from Harrison Circuit Court.—*Hon. P. C. Stepp,* Judge. ·

REVERSED AND REMANDED *(with directions).*

*J. C. Wilson* and *Peery & Lyons* for appellant.

(1)   The evidence is wholly insufficient to show that defendant was incompetent to contract.   The only evidence as to his incompetency was to the effect that he believed gold existed in the soil of that part of the State of Illinois where he lived; that he was guilty of unusual conduct in the manner of cultivating and improving his farm; that he would sometimes abruptly change the subject in conversations, and that he would sometimes change his plans and views.   There was no single instance given of a foolish or improvident contract having been made by him.   Cutter v. Zollinger, 117 Mo. 101; State ex rel. v. Grand Lodge, 78 Mo. 556; Riley v. Sherwood, 144 Mo. 354; Sehr v. Lindeman, 153 Mo. 276; Cash v. Lust, 142 Mo. 630; Fulbright v. Perry Co., 145 Mo. 432. Mere opinions of witnesses that the testator was "childish," or acted "funny," or was "worse than a child," unaccompanied by any testimony showing any particular act or fact evidencing incompetency, do not make out a case of incompetency, when the testimony shows that the testator knew what he was doing, and to whom he was giving his property.   Sehr v. Lindemann, 153 Mo. 276.   Eccentricities of character in the testator, mental peculiarities, unusual conduct in the manner of cultivating his farm and in managing his property, do not establish an unsound mind or show incompetency on the part of the testator.   Fulbright v. Perry Co., 145 Mo. 432.   (2) The party seeking to set aside such conveyance on the ground of the incapacity of the grantor to make it must tender back the consideration and interest thereon.   McKenzie v. Donnell, 151 Mo. 431; Rhoades v. Fuller, 139 Mo. 179; Wells v. Mut. Ben. Assn., 126 Mo. 630; Jamison v. Culligan, 151 Mo. 410.   False representations will not afford sufficient ground for the rescission of a contract, where the complaining party had at hand the means of knowing the real facts and neglected to avail himself of them.   Lewis v. Land Co., 124 Mo. 687; Cooley on Torts (2 Ed.), 570.   It must be shown that deceit was practiced, and for the purpose of putting the vendee off

his guard, or that special confidence was reposed in the representations, and that the contract was entered into on the strength of the statement. And the proof must be clear. If the buyer trust to representations not calculated to impose on men of ordinary prudence, or neglect means of information easily within his reach, he can not recover. Dunn v. White, 63 Mo. 181; Holland v. Anderson, 38 Mo. 55; Wannell v. Kem, 57 Mo. 478; Wade v. Ringo, 122 Mo. 322; Powell v. Adams, 98 Mo. 598; Baily v. Smock, 61 Mo. 218; Bryan v. Hitchcock, 43 Mo. 527; Parker v. Marquis, 64 Mo. 38; Anderson v. McPike, 86 Mo. 293; Warren v. Ritchie, 128 Mo. 311. Representations as to the money and rental value of the property, which was open to observation, and whose value one who had contracted to trade for it knew, or might have known, being mere matters of opinion, afford no ground for the rescission of a contract, although such representations may have been untrue; and although the representations are supported by statements of frequent recent sales of the property at certain specific sums and of the property renting at certain annual rental. Cornwall v. Real Estate Co., 150 Mo. 377; Cahn v. Reid, 18 Mo. App. 115; Morris v. McMahan, 74 Mo. App. 494; Bullock v. Wooldridge, 42 Mo. App. 356; Boyse v. Jamison, 124 Mo. 557. (3) Plaintiff is an innocent purchaser. Having advanced to L. B. Wilson $500 of the purchase money for the Alabama land, and at the time of the conveyance to him by L. B. Wilson having also cancelled and surrendered obligations of his said son to the additional amount of $1,000, was clearly a purchaser for value. 2 Pom. Eq. Jur., sec. 747; Wine Co. v. Reinhart, 42 Mo. App. 171. The mere fact that plaintiff is the father of L. B. Wilson is not sufficient to show that plaintiff is not a purchaser in good faith. The relationship of the parties does not prove fraud or notice on the part of plaintiff. Robinson v. Dryden, 118 Mo. 534; Ettlinger v. Kohn, 134 Mo. 492; Kerstner v. Varweg, 130 Mo. 200. (4) The cross-bill in

this case is insufficient to support the decree, or to entitle the defendant to the relief asked for, because it does not allege a tender to L. B. Wilson of the cash payment and re-conveyance of the Alabama land. Ailey v. Burnett, 134 Mo. 313; Ochs v. Railroad, 130 Mo. 27; McKenzie v. Donnell, 151 Mo. 431; Wells v. Mut. Ben. Assn., 126 Mo. 630; Jamison v. Culligan, 151 Mo. 410. (5) The failure of defendant to testify is fatal to his recovery for the reason that he must prove that he believed the alleged false representations to be true and that he had relied upon them, and such facts could not be proven by "proxy" as was attempted to be done in this case. Bent v. Lewis, 88 Mo. 470; Eck v. Hatcher, 58 Mo. 235; Mabary v. McClurg, 74 Mo. 575; Diel v. Railroad, 37 Mo. App. 454; 2 Whart. Ev. (2 Ed.), sec. 1266; Lawson on Presumpt. Ev., pp. 120, 121, 122. et seq.; Life Ins. Co. v. Smith, 117 Mo. 261; Leeper v. Bates, 85 Mo. 228; Brown v. Shock, 77 Pa. St. 471. (6) The decree is erroneous upon its face for several reasons: (a) It purports to adjudicate and determine the rights of L. B. Wilson in the premises, and to decree the rescission of a contract and conveyance between him and the defendant, when he is not a party to the action, and the court had no jurisdiction over him. 5 Ency. P. and P., p. 955; Harris v. Vinyard, 42 Mo. 568; Froyer v. Wood, 96 Mo. 478; Crawford v. Aultman Co., 139 Mo. 262; O'Fallon v. Clopton, 89 Mo. 284; Butler v. Lawson, 72 Mo. 246; Holt Co. v. Harmon, 59 Mo. 165; Mays v. Pryce, 95 Mo. 603. Under the issues made, and with the parties before the court, the defendant, if entitled to a judgment at all, could only have a general finding in his favor as to the possession of the land, and in no event was he entitled to the decree which he obtained. Thummel v. Holden, 149 Mo. 667; Crawford v. Aultman Co., 139 Mo. 262. (b) The decree is also erroneous because it attempts to adjudicate issues and determine questions entirely outside of and beyond the pleadings in the case. It is provided in the decree that the

deeds shall be cancelled, etc., and that defendant shall, within ten days, pay to the clerk, for the use of L. B. Wilson, who is not a party to the suit, the sum of thirty dollars. Now, there was no issue raised, either by the petition, answer and cross-bill or the reply, in regard to the payment of, or the tender, or the offer to pay, any money to or for L. B. Wilson. It is settled that a judgment or decree can not cover or dispose of issues not made by the pleadings. White v. Rush, 58 Mo. 105; Irwin v. Chiles, 28 Mo. 576; Thrush v. Cameron, 21 Mo. App. 394; Newman v. Kenton, 79 Mo. 382; Ross v. Ross, 81 Mo. 84; Dougherty v. Adkins, 81 Mo. 411; Funkhouser v. Lacy, 78 Mo. 458; Bank v. Poyntz, 60 Mo. 531.

*Wanamaker & Barlow* and *J. W. Alexander* for respondents.

(1) The evidence fully establishes the incompetency of defendant to contract. A meeting of minds is essential to a contract. Barton v. Hunter, 59 Mo. App. 610; Martin v. Baker, 135 Mo. 503. A grantor in a deed may avoid the conveyance by showing that he was *non compos mentis* at the time it was executed. Culter v. Zollinger, 117 Mo. 101; Tolson v. Garner, 15 Mo. 494. A conveyance obtained without sufficient consideration from a man of weakened intellect, by a person having influence with him, practicing upon his passions, will be set aside on application of the grantor. Freeland v. Eldridge, 19 Mo. 325; Nichols & Shepard Co. v. Hardman, 62 Mo. App. 153; Kroenung v. Goehri, 112 Mo. 641; 2 White & Tudor Lead Cas., part 2, p. 1242; 1 Story Eq., secs. 227, 228, 234, 235, 236, 237, 244, 246; 2 Pom. Eq., 926, et seq; Dingman v. Rome, 141 Mo. 475; McKissock v. Groome, 148 Mo. 467. (2) All surprise, trick, cunning, dissembling, and any unfair way by which another is cheated, is fraud. Barr v.

Baker, 9 Mo. 854; Thompson v. Cohen, 127 Mo. 229; Kehoe v. Taylor, 31 Mo. App. 588. Where the criminating facts are of a character to lead a reasonable and fair-minded person to infer a fraudulent and dishonest purpose, in spite of the sworn statements of witnesses, the fraud will be inferred, and will be relieved against. Ridge v. Greenwell, 53 Mo. App. 479. Whilst fraud is not presumed, it may be inferred, and will be unless the facts and circumstances consist as well with honesty and fair dealing, as with a fraudulent purpose, and unless they do, the act will not be referred to the better motive. Ridge v. Greenwell, supra; Garesche v. Macdonald, 103 Mo. 1; Gordon v. Ismay, 55 Mo. App. 323; Robinson v. Dryden, 118 Mo. 524; Goetz v. Flanders, 118 Mo. 342. To require, therefore, that a plaintiff, in order to make his pleading good in order to prevent his being sent out of court on account of a defective pleading, should be compelled to do what the unascertained and unascertainable equities of his case demand, seems altogether unreasonable. Kline v. Vogel, 92 Mo. 245; Hatchett v. Emerson, 73 Mo. App. 282; Loeffel v. Pohlman, 47 Mo. App. 574; McKenzie v. Donnell, 151 Mo. 460. (3) Plaintiff is not an innocent purchaser. This is clearly shown by the evidence. His presence at the Jackson residence where Worrell is trying to ring in a consummation of the deal. His presence on October 26, 1895, at Hicks' office, when Hicks goes to secure the deed. His knowledge that L. B. Wilson is obtaining the $2,000 Missouri land for $500. His bringing the $500 there for that purpose. His own declaration that he turned over $1,500 in all to L. B. Wilson, shows that he knew the value of the Missouri land, and was getting his money back. Ridge v. Greenwell, supra.

VALLIANT, J.—Ejectment for eighty acres of land in Harrison county. Defendant Jackson claims to be the owner of the land and is in possession by his co-defendant, Cupp, who is his tenant.

Plaintiff claims title under a deed from defendant Jackson. The petition is in the usual form. The answer of defendant Cupp, is in substance a general denial; that of defendant Jackson is in the nature of a cross-bill in equity to set aside his deed under which the plaintiff claims on the ground that it was obtained by fraud.

Jackson, whom we will hereinafter call the defendant, by his answer states substantially that he is a man of weak mind, 70 years old, no education, living in Monticello, Illinois, and owning the land in question; that in September, 1895, one L. B. Wilson, son of the plaintiff, came to defendant's house and with the intent to cheat and defraud him out of his land represented that he (Wilson) was the owner of large tracts of lands in Alabama, of great value, which he would sell or trade and that those who would buy of him would make great profits; that he had learned that defendant was a man of prominence and influence in the community, and that as he was desirous of establishing a colony on this Alabama land he wished defendant to go with him and see the land with a view that on his return he would influence others to go and buy land there; that by such means he did influence defendant to go with him to Alabama and there traded 200 acres of land to him for this 80 acres in suit; that he represented to defendant that on that 200 acres of Alabama land were fifty acres of valuable timber, that lumber could be sold there for $50 a thousand, the land yielded from three to four tons of grass annually worth in the market from $10 to $15 a ton, would also yield 60 to 80 bushels of dry-ground rice per acre worth $1 a bushel, and that he had a complete record title, all of which representations were false and made with the fraudulent intent to cheat the defendant; that Wilson also proposed to defendant that if he did not care to farm the Alabama land himself he (Wilson) would take a lease from him for five years of the 200-acre tract and pay him $800 a year for rent giving him well-secured bankable notes for the same;

that on October 26, 1895, after defendant and Wilson returned from Alabama, the latter sent his agent, one Hicks, to defendant's home, who fraudulently pretending to have defendant execute the five-year lease spoken of, in duplicate, obtained not only his signature to the lease, but also a deed from defendant to Wilson of the 80 acres in suit, which Hicks carried away, leaving with defendant a deed from Wilson to defendant of the 200 acres of Alabama land, and a duplicate of the lease, and instead of the five well-secured notes for $800 each, agreed on, he left only five unsecured notes of Wilson for $200 each; that at the time defendant thought he was signing only the lease, and that the execution of the deed to the Missouri land was to be postponed until the security was given on the rent notes; that defendant believing all the representations of Wilson above mentioned, was ready to close the trade on that day, as soon as Wilson should give the security on the rent notes; that the plaintiff in this suit claims to have received a deed to the land from L. B. Wilson, but that he took such deed with knowledge that the deed from defendant was obtained by the fraud above mentioned. The prayer of the answer is that the deed from defendant to Wilson be cancelled, and for general relief. The reply joins issue on all the averments in the answer.

Upon the trial the plaintiff introduced evidence tending to show that the rental value of the land in suit was $100 or $125 a year and rested.

The defendant's evidence was first directed to the question of his mental capacity. This began in the cross-examination of one of plaintiff's witnesses, a farmer living near the land in suit, who had seen defendant on his visits to Missouri to look after this farm. This witness said that in his opinion, although defendant did in fact transact his own business, he was not competent to do so. The witness said: "He was looking after his land when he was here. He made a contract for his board with my wife, paid part of it and part is not

paid. So far as him contracting and using this land, and taking care of himself, he made fair contracts." When asked for facts on which he based his unfavorable opinion of the defendant's mental capacity, the witness said that on one occasion he (the witness) had cut down a hedge, and defendant had hauled it and put it in a branch and it was washed away; that defendant had made a maul out of an old hard knot, which came to pieces before he got one post made; he would pick up little sticks and pile them up for wood; would begin one conversation and go right off on another. Witness bought this land from him once, but he backed out, that is, witness had offered him the full value of the land, he agreed to take it, and then backed out.

Then defendant read on this point, depositions of several persons living in Monticello, Illinois, who had known defendant for years, as follows:

A. L. Rodgers, clerk of the county court, said: "I don't think he is competent to transact business. I don't think he is competent to undertake the exchange of properties or their sale or to make papers transferring real estate." Witness stated no facts on which he based his opinion.

Frank Harrington thought he was not competent to transact business. "A man who would take a shovel and dig up the streets for gold, I consider that is a man not being sound."

Charles Bryden: "I should not say his mind was strong. I should say he was not competent to do business. His conversations were incoherent. He had an idea that this whole country was inlaid with gold. . . . I do not think he would be able to comprehend the meaning and purport of a legal instrument."

Mary J. Bryden: "I considered him queer. He was constantly talking of his expectations of finding gold. I don't think he had any knowledge of the real value of property. I have often said to my sons that I would not want Jacob to sell a calf for us. . . . He didn't seem to know what his

work was worth. He did work for us. He would sometimes charge big prices. Unloading a load of hay he thought it was worth as much as the hay was. He didn't say he thought it was worth as much as the hay was, but I thought his price was a little high. It was nearly what the hay was worth. . . . . . . I paid him what I would any other man for the same work, and after he was over with it, and, as we say, got cooled off, it seemed all right."

N. E. Rhoades: "I never thought he was a man of very strong mind, thought he was a little off. I wouldn't consider him qualified to transact business such as trading, exchanging real estate and buying and selling farms. I refer to his mental capacity on quite a number of different conversations I have had, more upon this mining question than anything else." Witness then went on to state substantially that defendant thought that gold ore existed in the soil in and around Monticello, that he thought he had discovered it in places and that if any one would back him with capital he would develop the mine. He had a rod with a ball on the end, which he believed would indicate the presence and depth of gold ore. Witness had him to experiment with the rod, but it indicated nothing. Defendant was peculiar in his manner of buying goods at witness's store; he would sometimes come in and look over a suit of clothes or a hat several times before he would purchase. "I should doubt very much his ability to make a careful deal if he was dealing for land. He was rather peculiar in a good many things."

John W. Dighton: "I have thought for a good many years back that he was not responsible for his actions. His conduct is unusual. I noticed him on a good many occasions, sort of picking up gold out on our farm. He had a little hunting bag and used to pick up all sorts of little glittering rock and carry it off, and I was informed, though I did not see it, that he dug some holes in our woods, but I didn't think it was altogether the work of one man. He impressed me

as a man who wouldn't be responsible for his actions.    His
conversations were not normal but seemed unconnected."    In
1896 he applied to witness for a loan on a piece of wood land
which witness declined because he did not think him respon-
sible.

Dr. J. D. Knott: "I couldn't say that I have had any
conversation with him; have observed his conduct and de-
meanor some.    I don't think he was of sound mind.    I don't
think he was fit to transact business.    I couldn't say that I
observed anything in particular as to his ability to compre-
hend the extent and value of property and of general business
affairs.    Everything I have observed has been in a general
way; I couldn't observe anything in particular.    I don't
think he was competent to make a transfer of real estate."
Witness said that he never treated defendant professionally,
and that the opinion given was non-professional; had not con-
versed with him to any extent, and never transacted any busi-
ness with him.    Defendant's idea of gold in the country had
something to do with the opinion given.

M. R. Davidson, a lawyer, lived just across the street
from defendant, saw and talked with him frequently.    "I
don't think from my observation of his conduct and talks with
him he would be competent to transact such business as you
have mentioned.    His ideas about the value and extent of
property in my opinion would be very vague and uncertain."
Witness knew the defendant and his brothers and sister and
visited them socially, but never had any business transaction
with defendant.    Defendant and his brother Henry, both had
the idea that gold could be found in that country.

William P. Smith testified to a conversation he had with
W. L. Wilson, in which witness told Wilson that defendant
was considered to be on the weak-minded order, and that
Wilson said the reason he had employed Hicks was that Hicks

Vol 167 mo—10

could get defendant's signature to the papers while he himself could not.

Geo. Miller, former sheriff of the county in which Monticello, Illinois, is situated, stated that he did not think defendant was competent to transact business. "Have had some little transactions with him. He seems to have the opinion that gold may be found in this locality. That may have made me think he was not strong-minded. When I was sheriff I sold a piece of land of his for taxes; could not get him to understand he had to redeem it. I have found a good many people whose land was sold who were the same way. I haven't had any deals with him. I couldn't say as to whether he is a man who guards his property interests very close. I have sold him goods, and he was always pretty hard to trade with. Whether he wasn't a judge of the goods, or whether he wanted to get it as cheap as he could I could not say. The question of his mental capacity has been talked of more since this trade than it was before." H. P. Harris: "I would not think from my observations and conversations with him that he was competent to transact business such as buying and selling real estate." Witness had had no transactions with defendant except that defendant would come into witness's store and buy things as other people did, in which he displayed no want of mental capacity; he was an economical man.

Dr. W. B. Campbell: "My observation would be that he was not capable of buying and selling real estate. . . . . He seems to be just weak-minded. He has a great notion about minerals, about finding minerals in the ground. That is the ground on which I base my opinion that he is weak-minded. It might be that Mr. Jackson is right about that, but it isn't very probable. I have frequently heard of gold being discovered just over the Indiana line. . . . . His weakness of mind, so far as I am able to state, is manifested by the fact that he believes in the presence of gold in the vicinity. So far as I know he seems to be rational on all other subjects.

It is true that a great many good business men have hobbies of some kind."

Dr. J. W. Coleman: "My knowledge of the man is somewhat limited in a certain sense. I have known him, as I have testified, a number of years. I have regarded him as rather a weak-minded man. . . . . I have never examined Mr. Jackson for the purpose of ascertaining his mental condition, nothing more than a casual observation of the man. I don't know that there is anything in his mental make-up that would prevent him from caring for his financial interests in a deal as men of ordinary prudence usually care for their business. The fact that he believes in the presence of gold in this vicinity constitutes largely but not altogether the ground upon which I base my opinion that he is weak-minded. I would judge that he is easily influenced. I never saw him put to the test. There might be a little gold in this vicinity but in the true sense there is none. I couldn't say outside of this one thing that he is wrong."

In addition to the foregoing depositions the following named witnesses testified at the trial on this point.

W. T. Chipps, who lives in Harrison county near this land, became acquainted with defendant on the occasion of his visits to Missouri, in 1894 and 1897. His estimate of the defendant was: "I wouldn't call him a very bright man, that is my judgment. He was more of a feeble-minded man, he was not stout."

The facts upon which this witness based his opinion were that defendant would sometimes want to fix his pasture one way and then would change to another way and did not seem to know just what he did want; and he tried to dam the branch with the brush from the hedge, which was foolish because the branch was too large. He was interested in his land and wanted to stop the washes; he made a contract with witness renting the pasture; it was a reasonable contract; no one came

with him from Illinois tò take care of him.   He had full charge of the land.

John W. Smith:   "I pronounced him a feeble-minded man.   In my own mind I don't believe he was capable of transacting business and making bargains. . . . . I base my opinion on the fact that he said he was going to take in a pasture and when he would take up a subject and talk and fly off without finishing it on to other subjects just like I have seen men before now do; didn't seem like his mind was settled fairly."

John T. Price testified that he had a conversation with defendant when the latter came to Missouri in 1897, in which defendant having said that he formerly lived in Miami, Ind., witness asked him if he knew his father-in-law, Dr. Miller, who lived there.   Defendant said he did not, but in a subsequent conversation he said he knew him very well; that Dr. Miller had practiced in his family, and then after that in another conversation he said he did not know Dr. Miller, never heard of him.   "His mind wandered in every direction. . . . I would not want to testify that the man was insane, or anything of that kind at all.   I don't think he was aware of the fact that he was going from one subject to another.   I don't know whether his mind was so far gone as to be incapable of doing business.   I would not state that."

Miss Jackson, sister of defendant, testified:   "For nearly twenty years my brother's mental condition has not been so that he was really competent to attend to business at all.   I have been attending to his business."

On the other branch of the case the defendant's testimony tended to show that L. B. Wilson and others were interested in Alabama lands under the firm name of Illinois & Alabama Land Company.   That L. B. Wilson came to defendant and made representations concerning these lands.   What those representations were, are thus stated in the testimony of Miss Jackson, the defendant's sister and chief witness:   "Well, he

told my brother that the land was so valuable down there, and he could raise so many bushels of dry-ground rice on this land and how valuable it was, and everything of that kind, until he got my brother to go down there. Said he could raise hay to great abundance; cotton grown, and anything he said that could be raised in the north could be raised there just as plentifully. He said the timber was valuable there, very large timber and valuable; he said it could be sold at great value, I don't remember just how much it was, but then it was a great deal more than what we could get for timber here."

Henry Jackson, a brother of defendant, stated that Wilson called at their house and asked for him and his brother and stated to him that "he was selling Alabama land, black land, rich land. Said it was very rich land, produced a great deal. . . . He said it would produce about 400 bushels of potatoes to the acre, Irish potatoes and sweet potatoes until you couldn't rest; and beans and dry-land rice beat anything in the world pretty near, and it would raise cane to make six hundred gallons to the acre. Said it was splendid timber on the land. There was all kinds pretty near except sugar tree— black walnut, hickory, bur oak, white oak, black oak, chinquepin. And this black oak was very large, hickory was splendid. He said the price would run from fifteen to twenty dollars an acre along there." Then the witness states that they went over to where defendant was: "Well, the conversation was with brother Jacob more and the same they said to me, stating about the land you know and what it would produce and so on, this dry-land rice, corn and grass and oats and sweet potatoes and Irish and sugar cane (they called it ribbon cane), that on an acre you could make six hundred gallons to the acre."

There was testimony on the part of defendant also to the effect that on the strength of these representations the defendant concluded to go to Alabama with Wilson to look at the lands and invited one of his neighbors, James Houselman, to go with him, agreeing to pay his expenses. The party were to

have taken a train that passed through Monticello at a late hour at night, but when Wilson and Houselman got on the train they discovered that defendant had not come, he having gone to sleep and failed to awaken in time. Wilson telegraphed back to the operator to awaken William Houselman, brother of James, and have him tell defendant that he (Wilson) would pay his expenses if he would go. Defendant went on the next train, joined the party at East St. Louis and they all went to Alabama together. It was on September 22, 1895, they started on the trip, and returned in about one week. While in Alabama a contract was made between Wilson and defendant to exchange the Alabama 200 acres for the Missouri 80 acres. About a week after their return Wilson was at defendant's house and talking about this business. Miss Jackson, sister of defendant, hearing, as she said, loud talking, went into the room and told Wilson that she attended to her brother's business and the defendant then said whatever she did would be satisfactory to him; that then the agreement was reached that the trade would be carried out on condition that Wilson would take a five-year lease of the Alabama land at $200 a year and give good bankable notes with security for the rent. That some days after, Mr. Hicks, a lawyer in Monticello, called at the Jackson home and saw defendant and his sister together, and in the conversation that ensued Hicks said that if defendant did not execute the deed to the Missouri land he would enter suit, to which the sister replied, "The quicker you enter suit the quicker we will know it is over with." She then told him what Wilson had agreed about renting the Alabama land and said if he did that they would trade, otherwise not, and Hicks went away. That on the following Saturday, which was October 26th, Hicks returned and had an interview with defendant, the sister then being absent, but defendant's brother Henry was present, in the course of which the deed to the Missouri land was executed by defendant, his signature being witnessed by Henry, and acknowledgment taken by

Hicks, notary public.  At the same time defendant executed a five-year lease of the Alabama land to Wilson, his signature to that being also witnessed by his brother Henry, and Hicks delivered to defendant, Wilson's deed to the Alabama land, his five rent notes for $200 each, and $30 to pay the expenses of the trip to Alabama.  According to Henry's testimony, he was able to read and write, but he witnessed the signatures of his brother to the deed and lease under the belief that it was only the lease he was signing, as Hicks said it was; did not know it was a deed; he said he looked at the notes and called attention of Hicks to the fact that the dates were wrong and Hicks corrected them; also objected that the notes had no security.  As soon as he discovered that he had signed his name as a witness to a deed, which was the next day, he went to Hicks's office, and asked for the paper he had signed, and Hicks gave him another paper that was of no consequence.

Defendant's testimony also tended to show that on the next day, or shortly after, he returned the papers Hicks had left with him, including the deed to the Alabama land, to Hicks, but Hicks refused to receive them and sent them back and they were passed to and fro between the parties in the mails.  Defendant never sent the deed to Alabama to be recorded, never paid taxes on the land, and it was sold for taxes and afterwards, in 1897, the record title still being in Wilson, it was sold under execution against Wilson by the sheriff in Alabama.  The deed to Wilson of the Alabama land shows that he paid $500 for it.  There was also some discrepancy in the dates which indicated that Wilson did not obtain a deed to the Alabama land until October 29th, whereas the exchange of deeds on the occasion of Hicks's visit occurred on October 26th.

On the part of plaintiff the testimony was to the effect that when the party got to Alabama the defendant and his friend, Houselman (who was a neighbor of his in Monticello, Illinois, sixty-one years old and a fruit-grower by occupation),

went out to look at the land.  Wilson did not go with them.
They were accompanied by two men, a Mr. King and a Mr.
Bohanon, who lived in that county, both of whom were farmers,
and King owned the land adjoining the 200 acres in question.
In this company defendant rode over the land and examined
it, after which they drove four miles to the residence of King,
and there Wilson joined the party.   Then the subject of trade
was discussed between Wilson and defendant.   The latter ex-
pressed himself as pleased with the land he had seen and
offered to exchange his 80 acres in Missouri for the 200 acres
in Alabama saying that his Missouri land was worth $2,500.
The negotiation resulted in a written contract, then and there,
for the exchange of one tract for the other, conditioned that
Wilson was to have two weeks time in which to examine the
Missouri land, and he had the option to refuse the trade if on
such examination the land was not satisfactory, but if satisfac-
tory the deeds were to be exchanged within thirty days.   Wil-
son at that time did not have a deed to the Alabama land, but
had a written contract giving him an option on it, which he
afterwards closed and took the deed in time to carry out his
contract with defendant.   After their return to Illinois de-
fendant asked Houselman to write to Mr. King and inquire if
he would sell 100 acres of his land adjoining the 200 acres,
that defendant had just bought.   While in Alabama a verbal
agreement was entered into whereby Wilson agreed to take a
lease of the Alabama land for five years at $200 a year, on
condition that defendant would make some little improvement
required.   Two or three weeks after their return to Illinois
defendant began to indicate a disinclination to carry out the
contract of exchange of lands.   Wilson employed Mr. Hicks,
a lawyer in Monticello, to attend to closing the matter.   Hicks
drew the necessary deeds and went to the home of defendant to
see him about it; there he had an interview with defendant
and his sister.   The latter objected to exchanging the deeds
then on the ground that Wilson had agreed to pay the expenses

of her brother's trip to Alabama, and had also agreed to take a five-year lease on the land, and insisted that those conditions should be complied with, nothing being said about security of the rent. Hicks said he had not been informed by his client on those points, but would see him about it, and if the agreement was that way would try to have it fulfilled. Hicks then left them, and in a few days after seeing Wilson, and he agreeing to the terms, returned to defendant's home with a draft of the deeds, lease in duplicate, notes, and the thirty dollars to refund the expense of the trip. At this interview the sister was not present, but the defendant's brother Henry was, and the papers were all read over to defendant and inspected by his brother, the latter discovering error in the dates of the rent notes which Hicks corrected; an abstract of title to the Alabama land was there, and was examined, discussed, and found satisfactory. Then the defendant executed a deed to the Missouri land, making his mark for signature, which Henry witnessed, and acknowledging it before Hicks as notary public and in like manner executed the five-year lease to the Alabama land. Hicks delivered the deed from Wilson for the Alabama land to defendant and the rent notes and the thirty dollars, receiving the deed from defendant to the Missouri land, and the lease, and at the request of defendant, Hicks as he was leaving, took the Alabama deed to forward it to Alabama, to be recorded. Shortly after Hicks returned to his office Henry Jackson came and said he wanted to see the deed. Hicks gave him the deed to the Alabama land and he carried it away. Shortly after, Hicks delivered the deed to the Missouri land to Wilson, and his connection with the matter ended.

The plaintiff's testimony also tended to show that no representations were made as to the character of the Alabama land except in a general way, that it would produce corn, oats and cotton, and almost all the products of land in the north. The assessor of the county in Alabama where the land is situate testified that it was worth $5 an acre, and that it and lands

. adjoining were assessed at that price.    Wilson testified that he had theretofore been advised that it was for sale at a sacrifice and had bought it with a view of selling it at a profit; that after he returned from Alabama, being indebted to his father, the plaintiff in this case, for money advanced to him in his business, he deeded this Missouri land to him for $1,500, taking credit on his account for that amount; that the plaintiff, when he took the deed, had no notice of any claim of defendant that he had been imposed upon in the trade.    Plaintiff's testimony also tended to show that defendant was a man of ordinary intelligence.

The court found for defendant on the issues tendered in the answer, and rendered a decree cancelling the deed from defendant to L. B. Wilson and the deed from the latter to the plaintiff, and that defendant was entitled to hold possession of the land and that plaintiff pay costs, etc., from which decree the plaintiff appeals.

We have been compelled to go through the evidence in this record and make extracts from it of unusual length for the reason that the case must turn rather on questions of fact than of law, for if all the propositions of law contended for by the learned counsel for respondent be correct, still if the evidence does not sustain the findings as to the facts, the principles of law invoked do not justify the decree.

Of course, if a man has not sufficient mental capacity to make a deed, the deed he attempts to make will be set aside. And it is true, as contended for respondent, that one may have mental capacity to make a will, when there is no overreaching mind to contend with, and yet be incompetent to deal with an adversary mind in a contract.    [Martin v. Baker, 135 Mo. 495.]    But if in making a will the weakened mind, though not incompetent to act alone, is overpowered by a stronger, the will can not stand.    The making of a will is the act of one mind, whereas the making of a deed is the coming together of two minds, each ordinarily seeking its own advantage.    It is in

that light that we say that a man may sometimes have strength of mind to make a will but not to make a deed. The principle of law is the same in each case, but it must be applied according to the circumstances in each. It is not sufficient in order to set aside a contract to show that the man who complains was not as strong-minded as the one with whom he dealt. The wheels of commerce would cease to turn if that were the law.

Now, what does the evidence of mental incapacity in this case amount to? At most it is mere opinions of non-experts founded on facts from which no such conclusions can be legitimately drawn. The most of them rest their opinions on the fact that the defendant believed that in and around Monticello, Illinois, gold ore could be found, a belief in which his brother, Henry, whom no one intimated was weak or unsound in mind, shared. Two of the witnesses thought that it was evidence of weakmindedness for a man to attempt to stop the injury to his land from the washing of a branch, by putting brush from a cut hedge into the branch. One founded his opinion on the fact that when first questioned, defendant had no recollection of a man whom he had known when he lived in Indiana, how many years ago was not shown, that he afterwards recollected him well and afterwards again said he did not recollect him. Another thought it foolish to plan his pasture one way, and then change to another. None of them ventured to say he was of unsound mind, nor would all of them say he could not contract ordinary business. The fact is he did transact ordinary business, came to Missouri alone, attended to his farm and made discreet contracts in relation to it. The opinions were generally qualified to the effect that he was not of sufficient intelligence to deal in real estate, buying and exchanging farms, or to understand the effect of a legal document. The business of buying, selling and exchanging real estate and understanding the effect of legal documents connected with such business, requires, in the opinion of some people, so much intelligence that a witness might with very

good conscience give an unfavorable opinion of the capacity of many men to do that kind of business, who are engaged in ordinary business every day, and whom the law holds to their contracts. There is no claim of abuse of confidence here for there was no fiduciary relation shown. These men traded at arm's length; neither had the right to trust the other beyond the bounds of common honesty.

Nor does the defendant's evidence support the allegations of fraudulent misrepresentations. Those representations related to what the Alabama land was capable of producing, evidently a matter of opinion, and not shown by the evidence to have been unwarranted. The evidence does not show that it was represented that the land had produced but that it could produce the articles mentioned in abundance. Representations of that character, even if unwarranted, are not misrepresentations of facts that would vitiate a contract. [Cornwall v. Real Estate Co., 150 Mo. 377.] Whether the land was capable of such production we do not know from this record.

Besides, this defendant did not rely on those representations; he went to Alabama to see for himself and took with him a neighbor and friend in whose judgment he had confidence. There is nothing in the record that justifies any reflection on the good sense or honesty of Mr. Houselman who accompanied the defendant on his trip. In addition to that there were these two men, farmers who lived in that vicinity, who went with him over the land. Can we suppose he asked no questions nor tried to learn anything, or are we warranted in concluding that every one he came in contact with was in a conspiracy to defraud him?

Nor was there such a discrepancy in the value as to call for equitable relief. The defendant's land was worth $1,600, and the Alabama land was, according to the testimony of the assessor, worth $1,000, and was assessed at that value. It does not appear at what value the defendant's land was assessed. The fact that Wilson found an opportunity to acquire

the Alabama land for $2.50 an acre and bought it on specula-
tion is no evidence of fraud.   He did not tell defendant what
he had paid for it, and was under no obligation to do so; he
told him when he talked with him about going to Alabama,
that the price would be fifteen or twenty dollars an acre, that
was his selling price.

As to the allegations of fraud in the act of exchanging the
deeds, the preponderance of the evidence is against the defend-
ant.    Mr. Hicks, whom .the evidence shows was at one time
prosecuting attorney of his county, and is a reputable lawyer,
gives a very straightforward history of the transaction and it
carries the air of truth with it.    It is idle to pretend that the
defendant and his brother, Henry, who was present and actively
participated in the execution of the deeds, believed they were
executing only a lease to the Alabama land and taking rent
notes for the same, while refusing to accept a deed to it and
refusing to execute his deed in exchange.    Why should Wil-
son take a lease of the Alabama land and give his notes for the
rent if the land belonged to him, and defendant refused to
have it?   By what principle of justice could defendant take
the five rent notes for $200 each and repudiate the rest of the
contract?   The answer avers that the agreement was that Wil-
son was to pay $800 a year for five years and give good
security for the payments.    In other words, defendant was to
get in exchange for his 80 acres of Missouri land worth $1,600,
200 acres of Alabama land leased for five years at an annual
rental of fifty per cent of the total value of the Missouri land.
Whilst there was no attempt to sustain that averment by proof,
the fact seems to illustrate the wide difference between the
defendant's *allegata* and his *probata.*

If the Alabama land has been suffered to be sold so that
it is now lost to defendant, he has only himself to reproach for
the loss.

The answer having converted the case into a suit in equity,

it is proper that the chancellor should dispose of the whole controversy by decree.

The judgment is reversed and the cause remanded to the circuit court of Harrison county, with directions to enter judgment for the plaintiff on the defendant's equity answer, and for the plaintiff for the possession of the land in suit, and one hundred dollars damages, assessing the rental value of the land at $100 a year from the tenth day of May, 1899, the date of the decree appealed from, and costs of suit, and award a writ of possession and execution for the damages, rents and costs. All concur.