## FRIEDRIKA OBST, Appellant, v. FRANK UNNERSTALL.

Division One, November 23, 1904.

1. **SETTING ASIDE DEED: Fraud.** A gratuitous deed may be set aside whenever the transaction is shown by the evidence to be fraudulent on its face.

2. ———: ———: **Mistake.** A deed may be set aside, irrespective of fraud, if it does not correctly reflect the agreement out of which it grew.

3. ⸻: ⸻: **Aged Grantor: Gratuitous Conveyance: How Considered.** A person *sui juris* has a right to give away his property if he chooses, and courts will not relieve against such a transaction merely because the act was voluntary or without consideration or for an inadequate consideration. But equity courts scrutinize such a conveyance with a jealous eye, and when it is to a third person to whom the grantor was under no obligation and to whom he owed no legal, moral or natural duty, or when the result is to strip the grantor of his property and to disinherit his offspring, the courts look into the transaction with a suspicious eye to discover the reason for it. And where the grantor is an aged woman, unable to read and write, and without business experience, who has derived no benefit from the conveyance, and acted without competent and disinterested advice, and the grantee admits that he counseled her not to tell any one about it, the law will right the wrong and restore the property, both because of a total failure of consideration and because the transaction is fraudulent on its face.

4. ⸻: ⸻: ⸻: ⸻: **Case Stated.** A widow, over eighty years old, unable to read and write, without business experience, with no children except a married daughter whom she had not seen for fifteen years, agreed to sell two lots, on one of which was her residence, for $1,250, but before delivery of the deed imposed the condition that she was to have the residence lot during her life, and this condition the prospective purchaser would not concede. Thereupon she sought the aid of defendant, whom she had often visited, to get the deed cancelled, and he said he would give her as much as any one else, and she agreed, according to her statement, to sell him the property for $1,200, one hundred cash and the balance as she needed it, and she was to have the right to live in the house during her life, and she testified that she did not know until afterwards that the deed was not made on those terms; but according to his statement he agreed to give $1,000 for the property to be paid to her daughter after her death, and she was to stay in the house during her life, or if she left it he was to take care of her. The deed was drawn up reciting a consideration of $1,000, and a note payable to the daughter six months after plaintiff's death was signed by him, and at the same time the notary drew up her will in which she appointed defendant her executor without bond, gave her daughter her "best wishes and what my executor gives her," and gave the bulk of her wardrobe to the defendant's wife. The deed was recorded, but the notary kept the note and will and refused to give them up when requested by plaintiff, and she says that she did not know until afterwards anything about the note. Defendant afterwards conveyed the residence lot back

to her, and the note was cancelled, and the condition in the deed to keep or care for her in case she left the house was expressly rescinded.  He also put up a partition fence between that lot and the one in suit, and says he spent thirty dollars for the fence and grape vines thereon, but he also got the grapes for that season.  *Held*, that the deed to that lot should be set aside, on his testimony, for failure of consideration and because the transaction is fraudulent on its face, and on his statement, in addition to those reasons, because the deed does not reflect correctly the agreement irrespective of the fraud.

5. ———: **Evidence of Other Fraud.** Testimony that the plaintiff, after defendant had reconveyed to her a part of the property which he had by imposing on her age and incompetency and confidence had her convey to him, had conveyed that part to a stepson at a sum much less than its worth and afterwards loaned to the stepson the money received from him, should not be received in evidence in the suit to set aside the deed to defendant of the balance of the property.  The stepson's fraud does not justify the defendant's prior fraud.

Appeal from Cape Girardeau Court of Common Pleas.
—*Hon. John A. Snider,* Judge.

REVERSED AND REMANDED (*with directions*).

*Wilson Cramer* for appellant.

(1)   The evidence establishes conclusively that the closest confidential relations existed between plaintiff and defendant, and that she relied upon him implicitly. (2)   The gain in the transaction was all on the defendant's side.  If the old lady had passed away without discovering the fraud, the $1,000 note would never have been heard of and her daughter would have been compelled to be content with defendant's generosity under that clause of the will which says, "to my daughter, Mary A. Peterson, I leave my best wishes and what my executor gives her."  (3)  By the arrangement made defendant not only got title to plaintiff's real estate for nothing, but practically became her residuary legatee.

*Robert L. Wilson* and *Angelo Dempsey* for respondent.

(1)   Actual fraud is a fact that has to be proven as any other fact, and the constitutive elements in actual fraud are suppression of truth or suggestion of falsehood. The evidence in this case does not tend to show actual fraud. 2 Pomeroy's Equity Jurisprudence (1 Ed.), sec. 922.   (2)   If it were possible for plaintiff to recover in this case, it would be to prove constructive fraud, and must show either inadequate consideration or gross inadequacy of price, undue influence, mental weakness or duress. Ib., secs. 925, 928. If there is nothing but mere inadequacy of price, the case must be extreme in order to call for the interposition of equity. (3)   If the inadequacy of price is so gross that it shocks the conscience the court will grant relief. Even then fraud and not inadequacy of price is the true and only cause for the interposition of equity and the granting of relief. Then must inequitable circumstances be proven to show fraud. There was no inadequacy in this case, and the proceeds would have gone to grantor's daughter and only child. Ib., 927.   (4)   Where there is no coercion amounting to duress, but the transaction is the result of a moral, social or domestic force exerted upon a party controlling the free action of his will and preventing any true consent, equity may relieve against the transaction on the ground of undue influence, even though there may be no invalidity at law. But where no antecedent fiduciary relations exist the confidence and undue influence must be proved by party seeking relief. There is such proof in this case. Ib., sec. 951. (5) It is well settled that mere weak-mindedness, whether natural or produced by old age, sickness or other infirmity, unaccompanied by any other inequitable act if the person has sufficient intelligence to understand the nature of the transaction, and is left to act upon his own free will, is not a sufficient ground to defeat the enforcement of an executory contract, or to set aside a

conveyance. Ib., sec. 947. There were no social rela-
tions between plaintiff and defendant that would re-
quire reference to authorities relating to social or moral
duress. Studybaker v. Colfield, 159 Mo. 612; Wilson v.
Jackson, 167 Mo. 154.

MARSHALL, J.—This is a bill in equity to set
aside a deed, made by the plaintiff to the defendant, to
lot 47 of Garaghty's addition to Cape Girardeau, on the
ground that it was procured by fraud and undue influ-
ence and because of failure of consideration. The an-
swer is a general denial. The trial court entered a
judgment for the defendant, and the plaintiff appealed.
This is a proceeding in equity and the facts will be
stated in the course of the opinion.

I.

The plaintiff is a four-times widow, and when the
deed sought to be set aside was made, she was over
eighty years old. Though so often playing the lottery
of life and though she had been the mother of five chil-
dren, at the time of the transaction complained of she
lived alone, having a few roomers, in a little three-room
cottage on the property conveyed. All her children
were dead except one daughter, who was married and
lived in Oregon, and she had visited her mother but
twice in fifteen years. The plaintiff was unable to read
or write, had no business training or experience, owned
lots 47 and 48 in Garaghty's addition to Cape Girar-
deau, lived in the cottage aforesaid that was located on
lot 48, had a few roomers who together paid her six dol-
lars a month, and raised grapes on lot 47, from which
she realized a small return. She had no other business
and her only care, outside of her occupation aforesaid,
was to pay her taxes. Besides the real estate, she
owned a note for three hundred dollars, which repre-
sented money she had loaned to a minister, and the
defendant's evidence tends quite indefinitely to show
that she had some money on hand, but the amount is not

accurately stated. The defendant had lived in the same neighborhood for many years, and she visited his house, but it appears that he did not visit her. Nevertheless she regarded him as her friend, sought his advice and acted upon it. Some time prior to this transaction she had agreed to sell the property to one Blomeyer, for $1,250, the purchase price to be secured by a mortgage on the property. After the deed was executed but before it was delivered and before the mortgage was made, she repented of the trade, and went to see the defendant about it and enlisted his aid to get the trade cancelled. She wanted it arranged so that she could live in the house during her life. She says that when she told the defendant about the transaction, he said he would give her as much for the property as anyone else, and that she agreed to sell the property to him, for $1,200, of which he was to pay her one hundred dollars in cash, and the balance as she needed it, and that she was to have the right to live in the house during her lifetime. The defendant says that for two months before the transaction she came to his house every day or every other day and wanted him to sell the property for her; that she had previously sold it but had cancelled the trade; that he saw the former purchaser and he would not buy and she then suggested that he buy it; that he told her he had no use for it, but as she said she did not want any money and wanted the purchase price paid to her daughter after her death, and wanted to stay in the house during her life, or if she left the house he was to take care of her, he agreed to take the property on those conditions, and to pay one thousand dollars for it. At any rate, the deed to the former purchaser was recalled and never delivered to him, and the plaintiff and defendant went to a notary's office to close up the trade between them, with the result that the deed was executed by the plaintiff to the defendant for the two lots, which recited that the consideration was one thousand dollars, the receipt of which was acknowledged,

and wherein it was stated that the plaintiff was to "retain the right to live in the home as long as she pleases, or if she changes her residence the said second party is to keep her and support her." At the same time the plaintiff made her will, whereby she appointed the defendant her executor without bond, made small specific devises, leaving the bulk of her wardrobe to the defendant's wife, and made the following provision for her only living child: "to my daughter Mary A. Peterson I leave my best wishes and what my executor gives her." The defendant then made a note for one thousand dollars payable six months after the plaintiff's death, to her said daughter. The defendant paid the plaintiff nothing whatever. He says he paid for the stamps on the deed, but did not pay for drawing the deed. The notary says that the plaintiff paid him for drawing the deed, but she denies this, and says she does not know who paid him. The deed was delivered and promptly recorded.

The notary kept possession of the will and the note and refused to give them up when requested by the plaintiff. The defendant says he spent about thirty dollars in putting up a partition fence between the two lots and in having the grape vines trimmed, and this and his trouble in the matter is the whole he is out on the transaction. When the defendant was putting up the partition fence, the plaintiff heard one of the defendant's little boys say that the defendant would soon have the plaintiff out of the house. This alarmed her, so that she took counsel with her friends. They demanded that the defendant cancel the transaction and reconvey the property. This he refused to do, but agreed so to do if the plaintiff would pay him two hundred and fifty dollars, which he explained upon the trial was to cover the thirty he had expended and the trouble he had had in the matter—which trouble he said consisted of his driving the plaintiff in his buggy about a mile, to the notary's office, about six times. When she

and her friends refused to do so, they arranged it so that he conveyed lot 48 back to her, the note for one thousand dollars was cancelled, and the condition in the deed from the plaintiff to the defendant requiring him to keep her and support her in case she left the house, was expressly rescinded. This left the matter in this shape: the defendant had title to and possession of lot 47, which he admits was worth three hundred dollars and for which he had expended about thirty dollars, and had gotten the crop of grapes off of it, but had never paid the plaintiff a cent, and the plaintiff had lost the lot. The only explanation the defendant gives for making the deed upon the terms as stated by the defendant is that the plaintiff did not need any money and was afraid that if she sold the property and got the cash, her relatives would get it away from her and it would be lost to her daughter, and therefore she wanted the note for the one thousand dollars made payable to her daughter. The notary says that he read the deed to her several times and that after it was executed she said she was rid of her cares and did not have to bother herself any more about her houses.

Reduced to its essentials the case made, in a word, is this: the plaintiff, an aged lady, owned two lots, worth at least twelve hundred dollars, on one of which was her little home, from which she received enough to live on. She deeded the property to the defendant, and made a will appointing him executor, without bond, left the bulk of her wardrobe to the defendant's wife, and practically disinherited her only child, by leaving her her best wishes and only what her executor chose to give her out of her estate. The plaintiff got nothing from the defendant, except the leave of the defendant to live in her own house as long as she lived, or if she chose to change her residence, the unguaranteed promise of the defendant to care for and support her during the short time that in the course of nature she would live. The defendant says he executed a note for $1,000,

payable to her daughter, six months after the plaintiff's death, but the note was never delivered to the plaintiff or her daughter, and according to the defendant was left with the notary, and he refused to give it to the plaintiff. Friends of the plaintiff demanded that the defendant rescind the deed, but he refused unless she would pay him two hundred and fifty dollars, and upon her inability and refusal to do so, he was induced by said friends to reconvey the lot on which the house was situated, upon the one thousand dollar note being cancelled and that he be released from his promise to care for and support her if she chose to leave her home. But the defendant retained the other lot, as he says, to pay him for the expense he had been to in trimming the grape vines and building the partition fence, and for his "trouble" in driving the plaintiff in his buggy to the notary's office about six times. The plaintiff has received no consideration whatever, and the defendant now has title to lot 47, without having paid anything for it and without being now under obligation to pay either the plaintiff or anyone anything for it.

The defendant sought to defeat the plaintiff in this action for the recovery of lot 47, by showing that after he reconveyed lot 48 to her, she sold it to her stepson for $500 in cash and his promise to support her and let her live in the home as long as she lived, and that a short time afterwards she loaned the $500 to her stepson, but the mere statement of the matter is enough to show that it is no defense to this action for the recovery of lot 47 that some one else has also defrauded her out of lot 48. The trial court erred in admitting such evidence, for if her stepson has also defrauded her, that wrong can not be remedied in this action and is no excuse to defendant for his conduct. Even if that testimony was admissible and was true, its only bearing on this case would be to show that the plaintiff is wholly unable to take proper care of her property, and to emphasize the wrong the defendant has done her.

Of course a person *sui juris* has a right to give away his property if he chooses, and courts will not relieve against such a transaction merely because the act was voluntary or without consideration or for an inadequate consideration. But courts scrutinize such transactions with a jealous eye, and when the conveyance is to a third person to whom the plaintiff was under no obligation and to whom he owed no legal, moral or natural duty, or when the result of the transaction is to strip the grantor, substantially, of all his property and to practically disinherit the offspring of the grantor, the courts look into it with a suspicious eye to see the reason and honesty of the transaction, and where, as here, the grantor is over eighty years old, and is unable to read or write, and has derived no benefit whatever from it, and has no business experience, and acted without proper and competent and independent and disinterested advice, and when the defendant admits that he counseled the grantor not to tell anyone about the transaction, the law will right the wrong and restore the property, both because of a total failure of consideration and because the transaction is fraudulent on its face. [Armstrong v. Logan, 115 Mo. 465; Martin v. Baker, 135 Mo. 495; Dingman v. Romine, 141 Mo. 466; Wilson v. Jackson, 167 Mo. 135.]

This conclusion is based upon the defendant's version of the contract. But when the plaintiff's version is considered the case becomes very different, and the wrong done much more flagrant. She says Blomeyer had offered her $1,250 for the house, which he was to secure by a mortgage, but she wanted to retain a life estate in the land, which Blomeyer would not agree to, and when she consulted the defendant about it and sought his aid to prevent the delivery of the deed she had made to Blomeyer, the defendant said he would give her as much for the property as anyone, and she agreed to sell it to him for that price, he to pay one hundred dollars cash, and the balance as she needed it,

and that he never paid anything and never gave her any note or writing, and that the deed was to be made upon these terms, and that she did not know that it was not so made, nor did she know anything about the one thousand dollar note payable to her daughter after her death, until later when she heard the defendant's son say the defendant would soon have her out of the house. Upon this showing the plaintiff would be entitled to have the deed set aside for a failure of consideration and because the deed does not reflect correctly the agreement, irrespective of the fraud.

Upon the whole case, it clearly appears that the plaintiff is entitled to the relief sought, and that the trial court erred in dismissing the bill. The judgment of the trial court is reversed and the cause remanded with directions to enter a decree cancelling the deed from the plaintiff to the defendant, and revesting the property in the plaintiff.

All concur, except *Robinson, J.*, absent.