DINGMAN et al. v. ROMINE et al., Appellants.

Division One, November 23, 1897.

1. **Undue Influence.** Any influence, however exercised, which destroys free agency and substitutes the will of another for that of the person in whose name the act brought in judgment is done, is undue and wrongful.

2. ———: EVIDENCE. As bearing on the question of undue influence, the relationship of the parties to each other, the mental condition of the person imposed on, and the character of the transaction, should be taken into consideration.

3. ———: ———: PRESUMPTION: BURDEN OF PROOF. If the relation of confidence and trust between the parties to a deed, which is sought to be set aside on the ground of undue influence; if the mind of the maker is weak and susceptible, and the transaction results beneficially to the grantee and detrimentally to the maker, a presumption of undue influence is raised, and the burden is placed on the one claiming the benefit of the transaction to prove that the act was voluntary and no unfairness was used.

4. ——: ——: PATIENT AND NURSE. Perhaps no relationship between men is more calculated to make the will of one subservient to that of the other, than that of patient and nurse continued through a period of years.

5. ——: ——: CASE STATED. The entire evidence on a case to set aside a deed on the ground that the grantee and her conspirators exercised an undue influence on the maker, is reviewed at length, and the conclusion reached that there was sufficient evidence to establish a presumption of such influence, and that the evidence in favor of the honesty of the transaction was not sufficient to overcome the presumption.

6. ——: PURCHASER WITH NOTICE. One who obtains title to land which has been obtained by the grantor through fraud on the prior owner, with knowledge of the character of the transaction, and without consideration, stands in no better position than his grantor.

*Appeal from Bates Circuit Court.*—HON. JAMES H. LAY, Judge.

AFFIRMED.

*Graves & Clark* and *T. W. Silvers* for appellant.

(1) Defendant filed a demurrer to plaintiff's evidence. This should have been sustained. There is not a scintilla of testimony, from first to last, concerning these conveyances, sought to be set aside. No witness mentions the circumstances under which they were executed. *Norton v. Paxton,* 110 Mo. 467; *Thompson v. Ish,* 99 Mo. 160; *Bush v. Lisle,* 89 Ky. 393; *White v. Stari,* 47 N. J. Eq. 244; 2 Greenl. Ev. [13 Ed.], sec. 688. (2) The facts in this case will not shift the burden. *Carl v. Gabel,* 120 Mo. 283; *McCulloch v. Campbell,* 49 Ark. 367. (3) Companionship with persons not at all related may produce the same influences as kinship and marriage, and if so, such influences are placed upon the same footing, and are not undue influence. This case shows nothing further in the evidence. *Sechrest v. Edwards,* 4 Mt. (Ky.) 163; *Higgins v. Carleton,* 28 Md. 115; *Floyd v. Floyd,* 3

Strob. 44. (4) The evidence totally fails to show any undue influence, either in a legal sense or otherwise, and the decree must have been and was made to rest upon the legal presumption of undue influence, raised by the proof of the situation and the relationship of the parties. Then if the presumption of undue influence is the basis of the decree, had it been removed? This presumption was thoroughly overcome. The burden of proof cast upon defendant was fully met and sustained by the evidence. Both before and after Jacob P. Dingman got his pension and this land, he did by his expressions to the witnesses show a fixed purpose to give it to Margaret Romine. This evidence of a fixed and oft repeated purpose is evidence that there was no undue influence, and that the act was his free and voluntary act and deed. *Thompson v. Ish*, 99 Mo. 160; *Rule v. Maupin*, 84 Mo. 587; *Couch v. Couch*, 7 Ala. 510; note to *Jackson v. Kiffin*, 3 Am. Dec. 397, and cases therein cited. (5) The doctrine that statments made long prior to the disposition of the property conveyed by deed, is evidence strongly tending to show a fixed intent and purpose to so convey, and evidence strongly rebutting any presumption of undue influence is as thoroughly recognized in this State, where the conveyance is by deed, as it is where the conveyance is by will. *Hamilton v. Armstrong*, 120 Mo. 610.

*H. W. Currey* and *J. S. Francisco* for respondents.

(1) The trial court has not eliminated the question of mental incapacity from the case, as appellants contend. *Rawlins v. Rawlins*, 102 Mo. 563; *Felton v. Gregory*, 104 Mo. 488; *Fulkerson v. Sappington*, 104 Mo. 472; *Mellier v. Bartlett*, 106 Mo. 381; *Lins v. Lenhardt*, 127 Mo. 271; *Warren v. Ritchie*, 128 Mo. 311. (2) Under the practice in this State equity cases are prac-

tically triable in the appellate court *de novo*. *Blount v. Skratt*, 113 Mo. 48. (3) The testimony of witnesses that Dingman had told them that he had been mistreated by his family and driven from home is mere "hearsay testimony" and is no evidence that he had in fact been mistreated and driven from home, but such testimony was admissible for the purpose of showing the condition of his mind and the state of his affections, and for no other purpose. *Gibson v. Gibson*, 24 Mo. 227; *Cawthorn v. Haynes*, 24 Mo. 236; *Johnson v. Quarles*, 46 Mo. 423; *Thomson v. Ish*, 99 Mo. 160; *Burdett v. May*, 100 Mo. 13; *Bush v. Bush*, 87 Mo. 480; *McFadin v. Catron*, 120 Mo. 274; *Walton v. Kendrick*, 122 Mo. 504; *Jones v. Roberts*, 37 Mo. App. 163; *Wynn v. Cory*, 48 Mo. 346; *Garland v. Smith*, 127 Mo. 567. (4) Jacob P. Dingman and Margaret and Jesse Romine stood in such relation to each other that confidence was necessarily reposed by Dingman in the Romines, and that influence which naturally grows out of that confidence was possessed by them; and this is all that is necessary to establish that fiduciary and confidential relation which invites the watchful and jealous care of a court of equity and renders the transaction between them presumptively invalid. 2 Pom. Eq. Jur. [2 Ed.], sec. 956; *Dunn v. Dunn*, 42 N. J. Eq. 431; *Garvin's Adm'r v. Williams*, 44 Mo. 465; *Cadwallader v. West*, 48 Mo. 483; *Yosti v. Laughran*, 49 Mo. 594; *Warrall's Appeal*, 110 Pa. St. 349; *Parker v. Parker*, 45 N. J. Eq. 224; *Maddox v. Maddox*, 114 Mo. 35. (5) The relations and duties involved in it need not be legal, but may be moral, social, domestic, or merely personal. 1 Story, Eq. Jur., ch. 7, sec. 323; 2 Pom. Eq. Jur. [2 Ed.], sec. 956; *Turner v. Turner*, 44 Mo. 535; *Cadwallader v. West*, 48 Mo. 483; *Street v. Goss*, 62 Mo. 228; *Bradshaw v. Yates*, 67 Mo. 228; *McClure v. Lewis*, 72 Mo. 314; *Harvey v. Sullens*,

46 Mo. 147; *Hamilton v. Armstrong*, 120 Mo. 597; *Carl v. Gabel*, 120 Mo. 283. (6) It was only necessary for the plaintiffs to prove that a confidential relation existed between Dingman and the Romines, or prove such facts as warrant the finding that confidential relations existed between them, and that the conveyance was made during the existence of such relations, and that the consideration therefor was inadequate. *Cadwallader v. West*, 48 Mo. 483; *Harvey v. Sullens*, 46 Mo. 147; *Garvin v. Williams*, 44 Mo. 465; *Yosti v. Laughran*, 49 Mo. 594; *Street v. Goss*, 62 Mo. 226; *Rankin v. Patton*, 65 Mo. 378; *Bradshaw v. Yates*, 67 Mo. 221. (7) After proof of facts from which a relation of confidence could be legitimately inferred between the grantor and the grantee, and the execution of the deed during the existence of such relation for a nominal consideration, the burden of proof shifts to the defendants. 2 Pom. Eq. Jur. [2 Ed.], sec. 956; 1 Story, Eq. Jur. [13 Ed.], ch. 7, sec. 323; *Yosti v. Laughran*, 49 Mo. 594; *Street v. Goss*, 62 Mo. 226; *Rankin v. Patton*, 65 Mo. 378; *Gay v. Gillilan*, 92 Mo. 250.

MACFARLANE, J.—Plaintiffs James J. and Melvin C. Dingman, as sole heirs of Jacob P. Dingman, deceased, sue the defendants Margaret and James C. Romine to set aside two deeds, one executed and delivered by the said deceased to defendant Margaret Romine on the eleventh day of July, 1889, by which he conveyed to her a tract of one hundred and fifty acres of land in Bates county for the expressed consideration of $1 and uniform kindness and motherly care; the other a deed from the said Margaret to her son, the defendant James C. Romine, dated January 2, 1892, for an expressed consideration of $2,400, conveying the same land to him. The *petition* charges

that the first of said deeds was without consideration, and was the result of the coercion, fraud and undue influence of the said Margaret and her husband Jesse Romine, and of one D. S. Snyder, over the grantor the said Jacob P. Dingman, and further, that the said Jacob P. Dingman had not sufficient capacity to make a deed, and that the latter of said deeds was accepted by the grantee with notice thereof. The *answer* admitted the execution and delivery of said deeds, but denied all other allegations of the petition.

A trial of the facts resulted in a *finding* by the court "that plaintiffs are the only heirs of Jacob P. Dingman, deceased; that the warranty deed executed by the said Jacob P. Dingman, dated July 11, 1889, was obtained by the said Margaret Romine by undue influence and was without consideration, and the said James C. Romine accepted his deed from the said Margaret without paying any consideration therefor and with notice of his grantor's fraud."

The *evidence* shows that at about the year 1874 Jacob P. Dingman lived with his wife and plaintiffs, his two children, then nine or ten years of age. He was at the time advanced in years and nearly blind, partially deaf, and otherwise afflicted with disease. In his condition he was unable to work or earn a support for his family, and lived in great poverty. About this time the wife and children secured homes in the families of neighbors and he left that neighborhood, and was thereafter, until 1887, supported by the county. He was taken care of by two or three families for a year or more each, the county paying his board, until about 1882, when he was taken into the family of Jesse Romine and his wife Margaret, both of whom appear to have been old people. He lived in this family until his death, which occurred about 1892. The county paid the Romine people for keeping him

as long as he remained a pauper. It appears that Dingman had been a Union soldier in the civil war, and some time previous to making his home with the Romines he had made application for a pension, but up to that time he had not been able to have it allowed. D. S. Snyder was employed in some capacity to assist him in securing his pension. In 1887 a pension of $72 per month was allowed and for arrearages he was paid $12,500. Out of this amount he paid Snyder $6,000, he expended about $500 in building a dwelling house on Romine's land, and bought the farm in question, paying therefor about $2,200. In 1887 he made his will by which he gave to one of his sons $500, to the other $10, and the residue of his estate he gave to Mrs. Romine. Romine thereafter received the pension quarterly, and for a time retained one half as compensation for boarding and caring for the pensioner and thereafter he retained the whole of it for the same services.

At the time Dingman went to Romines to live he had become totally blind, his deafness had greatly increased, and his other afflictions had rendered him about helpless. He was confined to his room and bed almost constantly from about 1887 to his death, and required the constant care and attention of a child. Mr. and Mrs. Romine and their son James waited upon and nursed him. Most of his business was transacted by Mr. Romine. He had great confidence in this family and regarded the members as his only friends. The evidence shows that they treated him with kindness and consideration. As one of the witnesses says, they cared for him as for a child. Dingman had the impression that he had been badly treated by his sons, particularly James. He so expressed himself frequently. To him he only gave $10. The reason for his disinheritance he gives in his will. In item 4 he says: "To my son James Judithan Dingman, of whose

whereabouts and condition I know nothing, sadly remembering his ever seeming want of affection and continued discourtesies and disrespectful conduct in his early manhood, and his gross and wanton neglect of me after I had become aged and infirm, I give and bequeath the sum of ten dollars only.'' There was no other evidence than Dingman's statements to show the truth of the facts stated in the will.

Both of the plaintiffs testified as witnesses. They state that their father, before leaving home, put them in families to live. They grew up without education, one of them saying he had not been to school a day. Early in life they went out to work for a living. They worked for wages at different places in Missouri and Kansas until the trial. One of them said that at one time he was worth about $50. They say that from the day their father left home until after his death they never heard from him directly, though it was reported to them that he was dead, and they believed the report. Their mother died in a few years after their father left home.

There was no evidence whatever of the circumstances under which the deed was made, though there was evidence that Dingman said before he received his pension that he intended to build Mr. Romine a house and buy this tract of land for his wife. In connection with his expressions of gratitude to the Romine family, he generally spoke of the mistreatment he had received from his boys. On the question of the mental capacity of Dingman there was a conflict in the evidence, some witnesses saying he was as helpless, mentally and physically, as a child, while others thought his mind good considering his physical condition. All the witnesses, with one or two exceptions, agree that physically he was absolutely helpless, and required constant care. Defendant James Romine testified that the amount

of the pension, $72 per month, was not more than adequate compensation for nursing, washing and caring for him.    These services were all performed by the Romine family, and, so far as appears, faithfully performed.    There is no. doubt, from the evidence, that Dingman had the greatest confidence in and affection for Mr. and Mrs. Romine, and that they deserved his gratitude if the services were unselfish and purely works of charity.    If prompted by selfish motives, they were entitled to ample compensation.

So far as concerns the conveyance from Mrs. Dingman to her son James there is no question but that he had full notice of all the circumstances under which the land was conveyed to her, nor does he attempt to prove any consideration therefor.    Appellant assigns no error to the finding of the court on this issue.

The court found that the conveyance in question was procured by means of undue influence exercised by the Romine family and Snyder over the mind and will of Dingman.    No finding in respect to the mental capacity of the grantor to attend to his affairs was made, and we assume that he was found to have sufficient capacity to understand the character and effect of the transaction.    The inquiry then is whether the finding of the court is justified by the evidence.

It may be remarked in the first place that undue influence does not imply the use of physical coercion or force.    Any influence, however exercised, which destroys free agency and substitutes the will of another for that of the person in whose name the act brought in judgment is done, is undue or wrongful. 2 Pomeroy, Eq., sec. 951; 27 Am. and Eng. Ency. of Law, 453.

As bearing on the question of undue influence, the relationship of the parties to each other, the mental condition of the person whose act is in question, and the character of the transaction, should be taken into

consideration.   If the relation of confidence and trust between the parties to the transaction exists; if the mind of the one nominally acting is weak and susceptible, and if the transaction results beneficially to the person charged, and detrimentally to the person in whose name the act was done, a presumption of undue influence is raised, and the burden is placed on the one claiming the benefit of the transaction to prove that the act was voluntary and no unfairness was used. Indeed, the presence of the relation of confidence and trust alone is generally sufficient to raise a presumption of undue influence; so, also, if the party acting be of weak mind and there is either no consideration, or a very inadequate one, a presumption against its validity arises.   2 Pomeroy's Eq., sec. 947; *Allore v. Jewell*, 94 U. S. 506; *Griffith v. Godey*, 113 U. S. 89.

The evidence shows that Dingman was, at least for the last four or five years of his life, physically helpless. He was blind, almost totally deaf, and otherwise so afflicted that he was seldom able to leave the house, even with assistance.   During this time, according to all the evidence, he was nursed and cared for by the Romine family.   He required as much attention as a child.   Whatever business he had was transacted by Mr. Romine and Mr. Snyder.   The large pension he received in 1887 was divided up by these parties, Snyder receiving about one half of it.   Mr. Romine received about $500 with which to pay for a house. After the money had been divided, Dingman received something over $4,000 of the $12,500.   It is true, after much explanation, they made him understand that the division was according to some previous agreements. For a time Snyder collected the pension quarterly; after that it was collected by Mr. Romine.   Indeed, all the business Dingman had was transacted by these parties. There is perhaps no relationship between men more

calculated to make the will of one subservient to that of the other, than the relation of patient and nurse continued throughout a period of years, the care being such as Dingman required. Moreover, there can be no doubt from the evidence that the mind of Dingman, on account of his infirmities, was very weak, and it was with much difficulty that he could be made to understand the simplest transaction, and then only when explained by Romine. That nothing was paid by Mrs. Romine on the land conveyed to her, is conceded. The relationship of Mr. and Mrs. Romine to Dingman, as patient and nurses, and his absolute dependence upon them, continued for eight or ten years, the relationship of Mr. Romine to him as principal and agent, the mental weakness of Dingman and the want of consideration for the land, make out a very clear case in which undue influence should be presumed.

The question then is whether the presumption that the deed was secured by undue influence has been overcome by defendants. It may be conceded that Dingman, if acting knowingly and of his own free will, had the perfect right to give the land to Mrs. Romine, but the burden of showing that he did so act is upon defendants. To determine this question, all the facts and circumstances should be considered together whether they were shown by one party or the other. As bearing on this question it is undisputed that Dingman, from the time he was taken into the Romine family, had no independent advice except such as he may have received from Snyder, who was assisting him in securing a pension. Inasmuch as Snyder received $6,000 for his advice and assistance, for clerical work only, as expressed by himself, and as this large sum was awarded to him in the presence of Romine without objection or protest, we can not regard Snyder as a disinterested advisor. On the contrary, the division of the pension money, as

made by Romine and Snyder, is strongly suggestive of a conspiracy between them to secure the entire benefit of this bounty of the government.

It is true, witnesses testify that Dingman on several occasions expressed an intention to build for the Romines a house on their land and to buy this land for Mrs. Romine. This evidence, in connection with other facts, is admissible to rebut the presumption of undue influence. The fact that he had formed the purpose long prior to making the deed, is evidence tending to prove that the act, when consummated, was voluntary and uninfluenced. Yet the weight to be given to these declarations depends upon all the circumstances. In this connection it should be remembered that Dingman was literally a pauper depending upon the county for support, and could with difficulty secure a home for the small sum the county was willing to pay. He was blind, nearly deaf, and sick. His necessities and condition were such that for the comforts of a home he could have been coerced into any agreement in respect to the future disposition of such an expectancy as a pension. When the pension money was divided, Mr. J. C. Clark, a banker, and wholly disinterested, was present. He was examined as a witness at the trial and in answer to a question said:

"*Q.* State what you think of his mental capacity. *A.* I can tell you how he answered the questions I asked him. I can not tell so much about his mind of course, because I could not tell how well he heard. The fact that he answered questions indicated that he heard them. Mr. Romine asked him several times, or told him rather, asked him what his agreement was. His pension was so much money, twelve thousand and so many dollars, and said 'Now we want you to make a check for so much of this money for such a

party and so much for another party,' and finally, after a good deal of explanation of that kind, he seemed to understand it, and he would answer a long time after, like his mind worked very slowly. He finally got to understand what was wanted, and he said that was all right and he would do that." This witness testified that a check for $400, $500 or $600 was drawn in favor of M. L. Graves to pay him for building a house on the Romine land. The witness was asked at whose suggestion that check was drawn. He answered: "Well, that was spoken of in the conversation, that he had agreed to build the house. Mr. Romine explained that to him. He told him that was to pay Mr. Graves to build a house." It is evident that the division of this money was in pursuance of an agreement previously made.

One of defendant's witnesses related a conversation with Dingman as follows: "Well, he told me he had gone down until he had nothing to live on. He said he was living with them and dependent on them for several years. He was going to get a pension. He said if he got that he would make it all right with them. He said afterward, he got his pension and calculated to build Mrs. Romine a good comfortable house and build a room where he could be comfortable. Then he said he was going to buy the King farm for them. He said they had taken good care of him when he had no money, and he calculated to buy that farm." In another connection the same witness testified: "He said he had deeded the farm to Mrs. Romine. He said anybody that was good to him before he had money, he was not afraid but what they would be good to him afterward." The witness testified to another conversation. "I talked to him about getting some money, after he got his pension. I needed some money and wanted to get it. He said go to Jesse, he could not see. Jesse

would attend to that." Another witness testified that Dingman said to him: "If I get my pension I am going to have Jesse Romine a new house with the first money I get when I draw my pension." Again, "When he got his pension he intended to buy the King farm and give it to Mrs. Romine for taking care of him when he had nothing to subsist on. She waited on him like a child, and took care of him."

In view of the fact that Dingman believed, whether that belief was well founded or not, that his children had driven him from home and had neglected him in his poverty and afflictions, this evidence, if it could be separated from other facts and circumstances, would go far toward rebutting the presumption of undue influence. The Romines were certainly entitled to his gratitude, and voluntary donations to them would not be unreasonable. But we see from the testimony of Clark that the house was built and the money was paid to Snyder pursuant to agreements previously made. The inference may be fairly drawn, and is the most reasonable one to be drawn, in the circumstances, that the land in question, which is the King farm, was given to Mrs. Romine under a similar promise. That being so, we think, in view of the situation of the parties and the dependence of Dingman upon the Romines, that the agreement itself stands in no more favorable light than the subsequent conveyance.

It is said by Pomeroy: "Whenever a person is in pecuniary necessity and distress, so that he would be likely to make any undue sacrifice, and advantage is taken of such condition to obtain from him a conveyance or contract which is unfair, made upon an inadequate consideration and the like, even though there be no actual duress or threats, equity may relieve defensively or affirmatively." 2 Pomeroy, Eq., sec. 948. So the same presumption of undue influence applies to

the agreement as to the conveyance. According to Clark's testimony about the only transaction, in its details, of which the evidence advises us, Romine only told Dingman what the agreement was and said "Now, we want you to make a check for so much of this money for such a party and so much for another party, and it was done."

Allowing the usual deference to the finding of the circuit judge on account of his better opportunities to judge of the credibility of the witnesses, and the weight to be given to their evidence, we see no good reason for interfering with the result reached. The judgment is affirmed. All the judges of this division concur.