## Margaret Ankeny Bonney, Appellant, v. Lawton C. Bonney, Appellee.

### Gen. No. 13,900.

1. RELEASE—*when set aside in equity.* A release from liability for the wrongful conversion of bonds will be set aside in equity if without consideration.

2. RELEASE—*what considered in equity in connection with bill to set aside.* If the consideration for a release is inadequate, a court of equity, in determining whether it should be set aside, will consider threats made to induce the execution of such release, as well as the necessities of the party executing the same, the condition of the health of such party, and all other circumstances which tend to show a countervailing of the will of such party.

BROWN, J., dissenting.

Bill in equity. Appeal from the Circuit Court of Cook county; the Hon. THOMAS G. WINDES, Judge, presiding. Heard in this court at the October term, 1907. Reversed and remanded. Opinion filed June 11, 1908.

**Statement by the Court.** This litigation is enmeshed with an original bill filed by appellant, twice amended, a cross-bill filed by Lawton C. Bonney, the appellee, and twice amended, a cross-bill injected at the instance of both the Bonneys in the name of the three minor children of appellant and Charles L. Bonney, and a cross-bill of Charles L. Bonney.

Demurrers of appellant were successfully interposed to the cross-bill and the first amendment thereto of appellee and her demurrer to the cross-bill of the minor children and her ex-husband, Charles L., were overruled, as were also like demurrers to the second amendment to appellee's cross-bill. Answers were filed by the several defendants to the original and cross-bills, and an amended and supplemental answer by appellant to appellee's cross-bill March 28, 1902, to which the usual general replications in chancery were interposed. The two infant cross-complainants, Ada Bonney and Valerian Bonney, on arriving at full age,

filed disclaimers and repudiated the actions of their guardian *ad litem* in filing a cross-bill in their name, and as to them the cross-bill was discontinued. On the issues thus joined the cause and cross-causes were heard before a master on reference, who filed his report recommending that the relief prayed by appellant be granted. Objections were filed before the master to his report by appellee, which objections being overruled by the master were again filed before the chancellor as exceptions to the master's report. The chancellor sustained the exceptions to the eighth and ninth findings of the master and overruled them as to the first seven findings, and after vacating the order entered December 23, 1902, restraining the prosecution of certain suits, on July 10, 1907, entered a decree dismissing the original bill as amended and all cross-bills for want of equity, from which decree appellant prosecutes this appeal.

The bill of appellant as amended seeks to have canceled a certain release made by appellant of date December 19, 1899, as being executed without consideration and under duress, and to have appellee decreed to deliver up and surrender to her thirty-one bonds of the Chicago General Railway Company, twenty-nine being of the face value of $1,000 each and two being of the face value of $500 each, making a total of $30,000 of said bonds at their par value; said bonds being the property of appellant and claimed by appellee in virtue of said release, or in default of delivering the bonds, that appellee account with and pay to appellant their value.

Appellant and cross-complainant Charles L. Bonney were husband and wife, and were divorced by decree of the Circuit Court entered of record December 19, 1899, the date of the release. Charles L. Bonney, prior to the last mentioned date, had been guilty of grave misconduct towards appellant, in which there was, to say the least, a strong suspicion that he had been guilty of adultery with a female travelling com-

panion while making a trip to Europe with his wife;
that he had been guilty of cruelty towards his wife,
as found in the decree divorcing them; that for a long
time prior to June 24, 1899, she was the owner of these
thirty-one bonds; that appellee represented to appel-
lant, who was about to depart for Europe with her
husband, that the Chicago General Railway Company,
with its franchises and property, was about to be sold
to other parties or to a corporation, and that the pur-
chaser would assume and guarantee its bonds, includ-
ing those held by her, and prevailed upon appellant
to leave her bonds subject to his order, so that he,
acting as her agent, might procure them to be guaran-
teed by the purchaser of the road should it be sold'
in her absence; that, relying upon these representa-
tions, she on June 24, 1899, took the bonds from the
vault in which she kept them and deposited them with
the Merchants Loan & Trust Company, the place sug-
gested by appellee, enclosed them in an envelope in-
dorsed to be delivered to appellee when he should
need them for the purpose of having them guaranteed
by a purchaser of the road; that appellant left Chicago
as contemplated, and returned to Chicago about Sep-
tember 1st following, and that owing to ill-treatment
by her husband she was made ill in body and dis-
tracted in mind; that thereafter, and on October 7,
1899, she was prevailed upon by appellee and her hus-
band to return to Europe with her two daughters and
a travelling companion; that appellee then assured her
that within six months the road would be sold and her
bonds guaranteed by the purchaser; that, relying on
these promises and the promise that money sufficient
to pay living expenses would be sent to her, she de-
parted for Rome, Italy, with her daughters and travel-
ling companion, but not receiving money for her ex-
penses and not hearing from her husband or appellee,
on November 23, 1899, she returned from Rome alone
to Chicago and went at once to the Merchants Loan &
Trust Company to get the then due interest coupons,

when she learned that appellee withdrew the bonds on November 6, 1899; she thereupon immediately went to the office of appellee to ascertain why the bonds had been taken away and not returned; that appellee then assured her that he had taken the bonds for the purpose of having them guaranteed by a prospective purchaser, and he anticipated that a sale would be consummated almost any day, and that when the bonds had been guaranteed by the purchaser, he would return them to her; that fearing some fraud was being practiced upon her, she demanded her bonds from appellee, but he insisted that a sale was near consummation; that the bonds were in his possession, and that interference of that kind might jeopordize a sale, and protesting that he had always acted in her interest, and would still protect her and her bonds if she would not withdraw them, saying that in a few days the sale of the road would be concluded and her bonds guaranteed and returned as promised; that appellee was so much wrought up over her demand that he cried and begged her not to interfere with the arrangement at that time and until a sale; that she became impressed with the sincerity of appellee's protestations, yielded, and permitted appellee to retain the bonds for the purpose of carrying out his promise to have them guaranteed.

There were many negotiations between appellant and her husband relative to a divorce and alimony. Frank P. Leffingwell, a lawyer and a mutual friend of the parties, acted as an intermediary in an endeavor to arrange an amicable adjustment both as to the grounds upon which the divorce should be sought and the amount of the alimony and support money for the children which should be paid. Major Connelly, an attorney at Rock Island, acted as the legal counsel and adviser of appellant, and the appellee in these arrangements acted in behalf of his brother Charles, who part of the time was also represented by a lawyer named Plumb. A final arrangement and understand-

ing was arrived at and concluded between the marital disputants on December 15, 1899. Such arrangement was perpetuated in the terms of the decree of divorce entered December 19, 1899. The divorce was entered on the charge of cruelty of Charles toward appellant and sustained by the testimony of appellee.

On starting with Leffingwell for the court in which appellant's divorce cause was to be heard, Leffingwell presented a release, written in pencil, and at the same time had her sign her name in ink to a blank paper, over which the release could be written in ink. Said release is. as follows:

"For value received I hereby waive any and all claim which I have or may be entitled to make against Lawton C. Bonney by reason of his having taken possession of and disposed of or otherwise used thirty (30) bonds of one thousand dollars each, which were owned by me and were deposited upon my departure for Europe with the Merchants Loan & Trust Company of Chicago, the said Lawton C. Bonney having withdrawn the same from the said bank about the month of November, 1899.

MARGARET ANKENY BONNEY. (SEAL.)

Dated Chicago, December 19, 1899.

Witness: FRANK P. LEFFINGWELL."

That appellant at that particular time first learned that appellee had made away with her bonds; that she was greatly upset and distracted in mind on receiving that information; that she would not have executed the release then if she had not been informed that her failing to do so would result in her failure to procure a divorce, and that appellee and her husband had threatened in that event to keep from her the possession of her children; that these threats so worked upon her feelings and so excited her fears that she was mentally unable to resist the unlawful demand so made, and signed the release, but that in fact such signing was without consideration; that fearing that she would lose her reason if she remained away from

her children, she returned December 31, 1899, to Rome, where she had left them, and did not again return to Chicago until June 14, 1900; that on December 22, 1900, she made a written demand upon appellee for a restoration to her of the thirty-one bonds, but they were not forthcoming, and that she does not know where they are; that appellee converted the bonds to his own use without right or authority, and that such action was a fraud upon her rights.

Appellee claims that appellant was never the owner of the thirty-one bonds, but that they were the property of his brother Charles; that they were left with the Merchants Loan & Trust Company bank in June, 1899, when appellant left for Europe, so that he might have access to them, and that on November 6, 1899, he withdrew the bonds from the bank; that the bonds had been given to appellant by her husband so that she might support the family from the interest, and that the bonds being needed by the Chicago General Railway Company, they pledged them for its benefit, and that the bonds are not within his control; that the conditions were explained to appellant and she authorized appellee to use them as he thought best for their joint interests; that on behalf of his brother Charles he negotiated the agreement for alimony which was carried into effect by the decree of December 19, 1899; that Charles was insolvent, and that appellee raised the alimony for him; that appellee paid Leffingwell $2,350 and Lamb $150 for appellant in cash, and also gave $10,000 in notes of Bonney Bros. and certain real estate in settlement and as a part consideration for the release.

Appellee by his cross-bill as amended seeks to nullify the decree for alimony and all the steps taken in compliance with its terms, to set aside the conveyances of real estate, to have returned the money paid, to have cancelled the notes for $10,000, and to enjoin suits pending on some and the bringing of other suits seeking to collect them. Appellee also insists in his

cross-bill that the agreement settling alimony was of a three-fold nature—between himself, appellant and her husband—and that the release of the date of the decree was given in part compliance with it, and with the intent of releasing. both the Bonneys from all claims of appellant; that the real estate was conveyed and the notes aggregating $10,000 were given to James D. Lamb, a brother of appellant to hold in trust for her and the children; that all that appellee did in securing the alimony to appellant was in settlement of the accounts between himself and Charles and in settlement with appellant of all claims growing out of their handling her moneys and property for the past eleven years, and prays for an accounting.

The cross-bill of the three minor children was filed by the procurance of appellee and Charles L. Bonney through a guardian *ad litem,* and avers the alleged tripartite agreement set up in the answer and cross-bill of appellee, and sets out its terms and avers a compliance by all the parties; claims one-half interest in all the property parted with by the Bonneys in settlement of the alimony decree and insists that if the bonds shall be adjudged to be returned, one-half of right belongs to them, and prays that their rights be ascertained and established under the so-called tripartite agreement.

When two of the children, Ada and Valerian, attained their majority, they repudiated the cross-bill filed in their behalf, and it was dismissed as to them, and on April 28, 1902, on sustaining of a demurrer, was dismissed out of court.

Charles L. Bonney filed a cross-bill averring that the thirty-one bonds in dispute belonged to him; that appellee took them from the bank and turned them over to the Chicago General Railway Company, and that the four notes of $2,500 each were given by appellee to appellant December 19, 1899, in consideration for the release of that date, and praying that the bonds be surrendered to him. The material averments

of this cross-bill were denied by the answer of appellant, which avers that the cross-bill was filed in collusion with appellee to harass and annoy her.

After a great deal of testimony had been taken before the master and appellee had put in evidence an account against appellant fortified by 321 vouchers, consisting mainly of checks of Bonney Bros., in which appellant was given a credit of $9,000 as the value of the thirty-one bonds, a balance appeared to be due from appellant to appellee of $47,102.61. Appellant, Lamb and the People's Trust & Savings Bank, obtained leave to and filed May 9, 1905, an amended additional and supplementary answer to the cross-bill of appellee. This answer, after reciting the averments of the second amended cross-bill of appellee, avers that Charles L. Bonney set up the same facts in case general number 225,283 in the Circuit Court, in which appellee appeared and also filed a cross-bill against the respondents and the minor children and said Charles, in which appellee alleged the making of the tripartite agreement, in which appellant agreed to release appellee from using her bonds in consideration of the money paid, notes delivered and real estate conveyed to Lamb on December 19, 1899, as shown by the decree of divorce in case general number 202,665 in said Circuit Court, and which decree was attached to the amended bill of said Charles in case No. 225,283, and that appellee also averred in said cross-bill, "That no actual consideration for said notes or cash of $150 and $2,350, were given or paid, and that the giving of the same was in the nature of a charitable donation to avoid the annoyance of a disagreeable woman." He further averred that he advanced the thirty-one bonds to Charles, who transferred them to appellant, and that he took them out of the bank and hypothecated them for the railroad company; that in said cross-bill appellee set up the same identical facts alleged in his cross-bill in the case at bar, and prayed for identically the same relief, using the same words

in each of his averments and prayers in each cross-bill; that the respondents filed a general and special demurrer to appellee's said cross-bill in said case general number 225,283, as well as to said bill of Charles; that upon a hearing of such demurrers the same were sustained and the bill and cross-bill of said Charles and appellee dismissed for want of equity; that an appeal to this court by Charles, appellee filing cross-errors, resulted in the judgment of dismissal being affirmed. Charles prosecuted a further appeal from the judgment of this court affirming the judgment of the Circuit Court to the Supreme Court, in which court appellee appeared and assigned cross-errors, and the Supreme Court affirmed the judgment of affirmance of this court. Said appellant invoked the doctrine of *res adjudicata* against appellee's cross-bill in the case at bar, and claimed that by reason of the matters alleged and former adjudications set forth appellee was estopped from further litigating them in this cause, and insisted that all testimony taken in appellee's cross cause should be stricken out and suppressed. The death of James D. Lamb being suggested, it was ordered that Garrett D. Lamb, the administrator of his estate, be substituted as a defendant in the cross-bill of appellee.

The master found the facts substantially in accord with appellant's contention. He specifically found that the bonds in question at the time of their conversion by appellee were the property of appellant and that such conversion was without warrant or authority from appellant; that the decree for alimony was entered in the divorce suit pursuant to an agreement entered into between the parties, to which appellee was privy, on December 15, 1899; that appellee on December 19, 1899, sent word to appellant that her bonds had not been guaranteed, but on the contrary he had hypothecated them; that the release was thereupon procured from appellant under a threat that failure to comply would be met by a strenuous opposi-

tion by the Bonneys to the divorce and an effort on their part to prevent her having the custody of her children; that in fear that such threats would be carried out, she signed the release written in pencil and attached her name in ink to a blank sheet of paper over which was subsequently written a release in the words of the one written in pencil; that at the time of signing the release appellant was in a highly nervous and excitable condition, and that the threats of appellee and his brother Charles that they would deprive her of her children amounted to duress, and had such an effect upon her mind as to cause her to sign the release without any regard to her right in the matter, and that there was no consideration for the execution of the release, and that the same is null and void.

The master recommended that a decree be entered directing appellee to account to appellant for the value of the bonds, and that all the cross-bills be dismissed. The chancellor sustained the exceptions of appellee to the master's report finding that the release was executed without consideration and under duress, and dismissed the bill as amended and all the cross-bills for want of equity.

Appellant prosecutes this appeal and makes twenty-two assignments of error upon the record.

THOMAS S. McCLELLAND, for appellant.

LYMAN M. PAINE, for appellee.

MR. PRESIDING JUSTICE HOLDOM delivered the opinion of the court.

While the numerous errors assigned present many questions of law and fact for our consideration, still we are in accord with the learned chancellor in his conclusion that the only serious questions necessary to be considered in the determination of the rights of the parties are as to whether in the execution of the release of December 19, 1899, there was present the element

of duress and whether the release was given without consideration.

The evidence in this case is somewhat voluminous— too much so to permit of its being set forth at any great length in this opinion. Neither is it the essence of reaching a correct conclusion that it be set forth *in extenso*. We shall refer to what, in our judgment, seems most essential to fortify the conclusions to which we have arrived.

We cannot refrain from saying, as introductory to our views, that we are impressed with the insincerity of the pretenses and conduct of appellee and his brother Charles, and the utter unreliability of their evidence as a whole. Their relations to this litigation abound in contradictions and inconsistencies. Their actions in this litigation and in the former suit on appeal, in this and the Supreme Court, show a studied purpose to befog the issues and unduly persecute appellant by involving the pleadings and issues in a maze of unnecessary cross-bills, answers and amendments to each. The injecting of the minor children of appellant into the case as cross-complainants was not done to serve any honest purpose, is plainly apparent, for as soon as the children lawfully could, they repudiated, as they should have done, the action of the intermeddlers prompted by appellee and Charles. The testimony of the latter will not be received as worthy of belief, except as it may be corroborated by credible testimony or by facts and circumstances manifest from the relations of the parties not in dispute, or unless sustained by the evidence of witnesses whom we regard as worthy of belief.

The marital relations of appellant and her husband seem to have been strained for many years prior to June, 1899, when she and her husband, with a young lady traveling companion, took an European trip. On this trip the young lady referred to as a traveling companion was made one of the party by the husband. The relations of Charles Bonney with this woman and his

attitude and actions with her were charged to be so scandalous that the health of appellant was much affected and she became very nervous and debilitated and continued in such condition for sometime thereafter. On the return from this European trip all semblance of marital felicity was abandoned and appellant and her husband parted. Appellee sympathized with appellant in the alleged moral delinquencies of his brother, her husband, and in that way gained appellant's confidence. He proffered his services as an intermediary between the husband and wife, and arranged for the maintenance of appellant and her children, and subsequently for the divorce and allowances for alimony which culminated in the decree of December 19, 1899. In October, 1899, appellee arranged for appellant and her children, with a lady friend, to go to Europe, in pursuance of which the party so composed went to Rome; the expenses of the journey were provided through appellee. Failing remittances and being otherwise disturbed, appellant on November 13, 1899, left her companion and children in Rome and started for Chicago, where she arrived ten days later. On the day after her arrival she went to the bank and ascertained that the thirty-one bonds had been taken away by appellee eighteen days before. On making this discovery she attended with Mr. Frank P. Leffingwell, a member of the Chicago bar and a mutual friend of the family, at the office of appellee and demanded the return of her bonds. · Appellee, while failing to return the bonds, admitted their possession, claimed that the road was about to be sold to other parties, that her husband was assiduously working up the details, that knowledge of her presence would unnerve him, upset the deal, destroy the prospect of a sale and involve all concerned in ruin, and begged her to go to her mother in Clinton, Iowa, and stay until the sale of the road was accomplished, which he expected would be within a few days. Appellee then assured appellant that her bonds would be guaranteed by the purchaser of the

road, and in that condition delivered to her. To these importunities appellant gave heed, with the request and upon the assurance that the progress of the sale as made should be communicated to her daily through Mr. Leffingwell.

In the early part of December negotiations were had by the parties looking to a divorce and a settlement of terms for suitable alimony.

Appellee was much concerned for the reputation of the Bonney family and desired that a divorce should not be sought for the marital infidelity of his brother Charles, and that a scandal of that nature should be avoided if possible. In the negotiations seeking a divorce with incident alimony, appellee represented his brother Charles. Appellant was represented by Major Connelly as her counsel, and Mr. Leffingwell advised appellant as a mutual friend anxious to avoid unnecessary friction, legal contest and resulting public notoriety. On December 14th negotiations proceeded to the point of disagreement; they, however, were resumed and concluded on the next day, December 15, 1899. The terms of the agreement then reached, both as to the grounds upon which the divorce should be asked and the terms of the allowances for alimony and support of the children of the marriage, were as provided in the decree of divorce and alimony entered December 19, 1899. Appellant yielded her assent to the lesser charge of cruelty, instead of the more serious one of adultery, on which to rest her claim for divorce, and appellee appeared and testified in support of the charge of cruelty. At the making of the final agreement December 15th there were present Leffingwell, Connelly, appellee, Plumb, an attorney representing Charles Bonney, and Ankeny, a brother of appellant. We regard the testimony of Leffingwell, corroborated as it is by Major Connelly and Mr. Ankeny, as the most reliable and controlling in our solution of the disputed facts. While Plumb does say the bonds were referred to in the negotiations of December 14th and 15th, still on

every other material point his evidence corroborates every material statement of Leffingwell, Connelly and Ankeny. Significant indeed is Plumb's testimony that the substance of the agreement, although written by him and embodied in the decree of divorce, yet. neither in his writing nor in the decree of divorce is there any mention whatever made of the bonds, appellant's release of them to appellee· or his brother, or a ratification of their final disposition by appellee. Leffingwell testifies that the whole subject of the negotiations of December 14th and 15th related to alimony and matters incident to the divorce suit, and the final agreement arrived at on December 15th was embodied in the decree of divorce; that no mention was made on either of these days of the thirty-one bonds, and that at no time were these bonds on either of those two days the subject of discussion. They did not enter in any manner into the alimony settlement. These statements are verified and sustained by the decree of December 19th and the testimony of the witnesses Connelly and Ankeny. These evidential facts must, as they do, control our judgment, as evidencing to our minds the fact that the decree states the terms agreed upon as a settlement of the alimony, and that nothing else was intended to be settled between any of the parties at that time. Mr. Leffingwell testifies that in the afternoon of the eighteenth or the morning of the nineteenth of December .he received the first intimation from any source that appellee wanted or thought of asking appellant for a release of his liability for misappropriating the bonds, or that the bonds had been disposed of by him contrary to right. Appellee said to Leffingwell, "I suppose Margaret will have no objection to giving me a release on account of those bonds." Leffingwell replied, "I don't know; I will have to speak to her about that." Leffingwell further says in his testimony that Charles Bonney and appellee both told him that if there was any fight in the matter on the part of Mrs. Bonney, Charles would put up—or they would put up—the big-

gest fight he knew how, to get the children and keep
them; not that appellee would make a fight for the
children, but he said Charles would, and Charles him-
self said emphatically he would. Leffingwell told all
this to appellant. Under this statement, and just as
she and Leffingwell were about to start for the court
to the divorce hearing, on December 19th, without time
for thought or in which to take counsel, and under a
nervous strain resulting from the past ill-treatment of
her husband, accentuated and increased by the threat
of attempting to deprive her of her children, she signed
the release in pencil and a blank sheet of paper in ink,
both of which appear in the record. For this release
no consideration whatever was given to or received
by appellant. That the bonds were appellant's, there
can be no doubt from the proofs; the record so states;
the husband and appellee have on several occasions ad-
mitted the fact, and their denial of that fact on the trial
and their pretenses to the contrary cannot be received
as overcoming or in any way weakening such convincing
proof. Such pretenses and denial belie all the cogent
evidential facts proving appellant's ownership of the
bonds.

The proofs undeniably show that appellant at and
since her marriage has been possessed of valuable real
estate and some personal property obtained from her
father; that at the time of her marriage neither her
husband nor appellee had any appreciable financial
means. Appellee was a bank clerk on a small salary,
and subsequently went into business with his brother
Charles, ostensibly in the real estate business, although
they also did some promoting, notably of the street car
line on Twenty-second street in Chicago. That firm
had not been dissolved at the time of the transactions
here involved, the statements of appellee to the con-
trary notwithstanding. The bank account was not
changed, neither was the firm's name. Bonney Bros.
continued ostensibly to be associated in active business,
with both members of the firm participating. As such

firm they appeared to their bankers, by continuing their account in the firm name. Irrespective of which particular member drew checks, either by habit or agreement, they both used the bank funds in the firm bank account, both for their business and individual purposes. Appellant entrusted to Bonney Bros. her business affairs for eleven years, during which time they sold her real estate and received the proceeds, made reinvestments of her property, and at times took title in the name of others; they likewise used her money and property indiscriminately, as they saw fit, regardless of her right and their duty, and as her financial agents at no time made any accounting to her of their dealings with her property. But appellee pretends to have stated an account before the master in which 321 vouchers are produced, most of which are checks payable to Charles L. Bonney, as are admittedly vouchers 218 to 264, aggregating the sum of $26,982.14. These items cover a series of years, and every dollar received by Charles L. Bonney, however used by him, whether personally or in his family, was charged to appellant. The Bonney Bros. seem to have assumed that appellant's estate and property was their own, to be used by them as they saw fit, and that she was to bear the burden of every expense. In such fashion did they use her estate, and to that extent they charged her account. By such methods and by like artifices they bring appellant into their debt $47,102.61, in which is included an item of $6,558.11, as interest on moneys claimed to have been advanced for her account. This account serves but one useful purpose, viz.: to verify the fact that the bonds were appellant's, and in this respect it is flatly contradictory to the oath of Lawton C. Bonney that the thirty-one railroad bonds were not appellant's, for in his eagerness to swell the amount of this pretended claim, appellant is charged $9,000 as the value of these thirty-one bonds, which Lawton C. Bonney, without right and in violation of the confidence placed in his assumed integrity by appellant, and in

abuse of that trust and confidence, disposed of them, and refused either to restore them on demand or pay their value, and now adds to his inexcusable and questionable conduct by denying that the bonds were appellant's at all.

The fallacy of the contention of appellee, that the release was given by appellant to him for a valuable consideration, arises from the unwarranted assumption that the money and notes delivered and the real estate conveyed to Lamb as trustee for appellant and her children moved from him and not from his brother Charles, and that the consideration for this property was the settlement of not only appellant's claim to the thirty-one bonds, but any other claim that she might have against him, and the further contention that the payment of the $2,500 in cash and the giving of the notes amounting to $10,000, which he obligated himself to pay, placing himself as to the notes in the position of a surety, was a consideration for the release. In the first place, we have grave doubts, from the trend of the evidence in this record, that if appellee should pay the notes himself he would then have requited appellant in the amount which would be her due on a fair accounting for money received by the firm of Bonney Bros. from the proceeds of her property, for which, as a member of that firm, he would be personally liable to her to pay. The real estate conveyed to Lamb was largely obtained with money and property rightfully belonging to appellant; this the greater weight of the evidence, to our minds, abundantly proves. Then again, whatever appellee did in the financial settlement with appellant set forth in the divorce decree, and whatever obligation or responsibility he assumed, was done and assumed for and in the interest of his brother Charles. Appellee was anxious to avoid a scandal which would become public should appellant seek a divorce for Charles' marital infidelity, and to escape such a scandal he was willing, if not anxious, for family reasons, to appease and mollify her. This is partly

evident from the fact that he testified on the trial to
sustain the less seriously regarded charge of cruelty.
The financial settlement was equally beneficial to appel-
lee. As a member of the firm of Bonney Bros. he
was liable to account to appellant for all his firm's
dealings with her property. In the unsettled condition
of their affairs it was to their mutual advantage to
get appellant's claims settled and out of the way. They
were anxious to protect their credit with their bank,
which was carrying large loans for them, and in their
efforts to reorganize the street car line it was essential
to success that they should not be hampered by claims
for accounting, with resulting attacks upon their busi-
ness methods and financial dealings. Appellee's brother
Charles had been derelict in his marriage vows; he had
treated his wife badly, as was established upon the
trial for divorce by the testimony of appellee. He was
not only his brother, but his partner, and it was only
natural that appellee should desire a settlement for
his brother, and through such settlement find an escape
from the disagreeable and compromising effects of the
situation. For the financial part of the difficulties ap-
pellee was equally responsible with his brother Charles
to appellant. All these considerations demonstrate
conclusively, we think, that appellee was acting in his
own interest and that of his brother Charles in the set-
tlement that was made with appellant. That the set-
tlement was for alimony according to the terms of the
decree, and nothing else. This being the conclusion
to which we have arrived, it is clear, regardless of all
other questions, that the release from appellant to ap-
pellee was given without consideration and is invalid,
and that a court of equity, on that ground alone, has
jurisdiction to grant the relief which appellant has
prayed in her bill.

We are firmly convinced that appellee took advan-
tage of appellant's weak and nervous condition in
threatening to help her husband resist her desire for
a divorce and to deprive her of the custody of her chil-

dren, as a means to the end of procuring, without consideration, a release from the liability cast upon him by the law in misappropriating appellant's thirty-one railroad bonds, and that he selected as the crucial moment in which best to accomplish his malign purpose the eve of the hearing of the divorce suit. Appellee unquestionably took an undue advantage of appellant, and used threats of resistance to her application for a divorce and of robbing her of the custody of her children to procure the release without consideration. Such conduct very nearly, if not quite, oversteps the line where free action ceases and duress results.

Leffingwell, however, admits that while appellant was much agitated and fearful lest she lose control of her children, according to the threats made, and believing that her husband and appellee would resort to unscrupulous means to make possible the carrying out of their threats, yet she knew what she was doing at the time and the consequences which would follow the execution of the release. It is apparent that appellant's situation was fraught with much difficulty, and her freedom of action, if not suspended, much curtailed. While, if there was an adequate consideration for the release, the circumscribing of the will of the party would not be regarded as sufficient to establish duress and thereby avoid it, on the other hand, where there is, as in this case, a total lack of consideration, the threats made and the undue advantage exercised will be circumstances of a controlling character with the courts in according relief from a contract or conveyance so unfairly and inequitably obtained. The rule is thus laid down in section 948, Pomeroy's Eq. Juris.: " * * * Whenever one person is in the power of another, so that a free exercise of his judgment and will would be impossible, or even difficult, and whenever a person is in pecuniary necessity and distress, so that he would be likely to make any undue sacrifice, and advantage is taken of such condition to obtain from him a conveyance or contract which is unfair, made upon an inade-

quate consideration and the like, even though there be
no actual duress or threats, equity may relieve de-
fensively or affirmatively.'' Buford v. Louisville etc.
R. R., 82 Ky. 286; Dingman v. Romine, 141 Mo. 466.

We think that a presumption of invalidity of the re-
lease arises from the circumstances of the threats made
and of the undue advantage taken of appellant's neces-
sities and her enfeebled health and nervous condition.
Although we do not deem it necessary to, nor do we,
place our decision upon the ground that the release was
procured by duress, it is sufficient to avoid it that it
was exacted without any consideration.

Willetts v. Willetts, 104 Ill. 122, was a case where the
wife entered into an agreement for separate mainte-
nance, in which she was overreached by her husband,
and the settlement was not commensurate with his
estate. It was executed by her while she was in a
weakened condition of health and suffering from harsh
treatment at the hands of her husband. She filed a bill
to set aside all the papers relating to the contract for
separate maintenance and for a separate maintenance
and a suitable allowance. The trial court granted the
relief prayed, set aside the contract of the wife, decreed
her separate maintenance with a suitable allowance for
that purpose. The decree was affirmed by the Appel-
late Court in the Second District, and in affirming the
decision of the Appellate Court the Supreme Court
say: ''We are of opinion that no cause is found requir-
ing that the decree of the Circuit Court should be dis-
turbed. The deeds and contracts and other papers
which are set aside by the decree of the Circuit Court
were executed and accepted by Mrs. Willets under such
circumstances that we think the court was fully war-
ranted in the conclusion that her acts were so far
affected by the undue influence of her husband that she
has a right to have the same set aside.'' Applying this
to the case at bar, we find that the release sought to be
avoided was not only executed by undue influence of
the husband, but by the coercion and improper influ-

ence of appellee. By parity of reasoning appellant is as much entitled to avoid her release as was the complainant in the Willetts case her contract of separate maintenance.

While we do not regard it as at all essential to a correct determination of the rights of the parties to this record to decide the applicability or not of the doctrine of *res adjudicata* fully presented by the pleadings and argued by counsel in their respective briefs, yet we will advert briefly to the litigation preceding this cause, as necessarily a part of the history of the case at bar and helpful in solving the rights of the parties here.

Charles L. Bonney refusing to pay any of the $2,500 notes given on account of alimony, appellant proceeded against him in the original cause by filing a petition for a rule on him to show cause why he did not pay. The court refused to grant the rule, and on appellant's bringing the record to this court for review, we reversed the decision of the Circuit Court and directed it to grant the rule to show cause as prayed in the petition. Bonney v. Bonney, 98 Ill. App. 129.

On February 14, 1902, Charles L. Bonney filed a bill in the Circuit Court of Cook county, setting up the conveyance to Lamb as trustee of the property constituting the alimony allowed by the decree of divorce between him and appellant of December 19, 1899, claiming a reversion in one-half upon the death of appellant. He alleged non-residence and waste on the part of Lamb as grounds for his removal as trustee. Charles L. Bonney, without notice to Lamb, filed "an amended supplemental bill," in which he made his wife and children, the appellee and the People's Trust & Savings Bank parties, and prayed, after attacking the actions preceding the decree of divorce and the settlement of alimony made in that decree, and impugning appellant's and Lamb's conduct, charging fraud of both in many matters specified, for an accounting; that the decree for alimony be reviewed and modified; that the

four notes for $2,500 each be considered canceled; that a new trustee be appointed, and for a preliminary injunction enjoining suits commenced or which might be commenced on the notes. To the latter bill, Mr. Lamb, appellant and the bank filed a general and special demurrer. Appellee, after answering, filed a cross-bill, setting up the same matters set out in the "amended and supplemental bill" and substantially the same matters appearing in the cross-bill in the case at bar. Appellee made all persons in his brother's bill, including his brother, defendants, and prayed *inter alia* for an accounting between appellant and Bonney Bros., between Charles and appellant for moneys advanced by him for family expenses; that Lamb be removed as trustee and another appointed, to whom Lamb should account; that the interest of appellant and the children, if any, in the property be determined; that the interest of appellee in the real estate be set off in severalty; that the $2,500 in cash be returned to him, etc.,—in substance the identical relief prayed by the present cross-bill.

To this cross-bill Lamb, the bank and appellant filed a general and special demurrer. The children, by a guardian *ad litem,* answered, and filed a cross-bill, claiming that they were the absolute owners of one-half of the property. The demurrers to the "amended and supplemental bill" of Charles was sustained, and he took leave to amend within five days; but instead of doing so, he filed an amendment to his original bill. It being made to appear that he had not complied with the order last referred to, his "amended and supplemental bill" was dismissed by the court, and the amendment to the original bill, having been filed without leave, was stricken from the files. The demurrers to the cross-bill of appellee were sustained, and it was likewise dismissed by the court. The cause was referred to a master on the issues made by the minors. The master heard evidence and filed his report, upon

the coming in of which the Circuit Court entered the following order:

"This cause coming on to be heard upon the pleadings and upon the report of the master to whom the same was referred, and it appearing that the Bank, Lamb and Margaret"—appellant—"were necessary parties to this suit and that their demurrers were sustained to the bill of complaint as amended, and that complainant elected to stand by his bill as amended, therefore ordered, that said master's report be approved and the bill of complaint as amended be dismissed for want of equity as to Lamb, Bank and Margaret, and dismissed for want of necessary parties as to the remainder of said defendants. That all crossbills be dismissed for want of necessary parties. That all defendants to said bill as amended recover costs against complainant and have execution therefor."

From this decree Charles L. Bonney appealed to this court, and appellee and the minors appeared and filed cross-errors. This court, on February 25, 1904, in case general number 11,158, in an opinion not reported, affirmed the decree of the Circuit Court. Charles sought a further review in the Supreme Court, where all of the parties appeared by counsel, and the decree of the Circuit Court and the judgment of this court were affirmed. Bonney v. Lamb, 210 Ill. 95.

The foregoing recitation of the nature of the litigation preceding this, we think, clearly demonstrates the futility and vexatiousness of the extended issues made in the pleadings filed and inspired by appellee in the case at bar; and we can only see in such actions a studied and maliciously designed plan to harass, annoy and tire out appellant in her legitimate contest in seeking to establish her legal rights and to procure the decision of the courts in affirmance of them. The Supreme Court in case *supra,* in characterizing the pleadings, said: "This record consists almost wholly of the pleadings filed by the several parties to the suit, which in many instances are very voluminous, and it would serve no useful purpose to incorporate even the substance thereof in this opinion."

Our conclusion is that the report and recommendations of the master correctly define the rights of the parties. The decree of the Circuit Court is therefore reversed and the cause remanded to that court with directions to enter a decree in accordance with the recommendations of the master's report, including the dismissal of all the cross-bills, and that the injunctional order of December 23, 1902, be vacated and set aside.

*Reversed and remanded, with directions.*

Mr. Justice BROWN dissenting.

My viewpoint in this case is different from that of the majority of the court.

I think we are concerned with only three questions, and it seems to me that the court below decided all of them correctly and that his dismissal of the bill was the necessary result thereof.

The first is: Was Mrs. Bonney on December 19, 1899, in such mental condition that she understood and appreciated what she was doing when she executed the release in question? I think the answer is shown by the evidence to be in the affirmative.

The second is: Was Mrs. Bonney under legal duress when she signed the release? I think the answer to this is in the negative. Fear of unscrupulous opposition to her in her suit for divorce is what is claimed by her. This was not legal duress.

The third is: Did Lawton Bonney give consideration for this release? It seems to me plain that he did. He was under no legal obligation to furnish any part of or any security for the alimony to be decreed against his brother. He did furnish money and incurred personal liability therefor, demanding the release before he did it.

In consideration of these matters and without reference to anything else treated of in the opinion of the court, or expressing dissent from its conclusions on the relative reliability of the testimony therein contained, I think the decree of the Circuit Court should be affirmed.